[S. F. No. 9256. In Bank.—July 30, 1920.]

A. MERZOIAN, Respondent, v. L. KLUDJIAN et al., Appellants.

[1] BROKER'S COMMISSIONS—PROCURING OF PURCHASER—ABILITY TO PURCHASE—INSUFFICIENCY OF EVIDENCE.—In an action by a broker to recover a commission for securing a purchaser ready, able, and willing to purchase certain real estate, evidence of verbal promises made by third parties without consideration to loan the purchaser the money is insufficient to show ability to purchase.

[2] ID.—RECOVERY OF COMMISSION—TENDER OF PRICE—WHEN UNNECESSARY—REFUSAL OF VENDOR TO SELL.—Where a vendor refuses to sell before the vendee has had the opportunity to show whether he is able to make the initial payment, a tender of such payment is unnecessary for the purpose of recovery of the broker's commission.

[3] ID.—EVIDENCE—WILLINGNESS OF BROKER TO ASSIST PURCHASER—EXCLUSION OF TESTIMONY UPON OBJECTION — RIGHT OF DEFENDANTS UNAFFECTED.—In an action by a broker to recover a commission for securing a purchaser ready, able, and willing to purchase real estate, the defendants were not precluded from questioning the sufficiency of the evidence as to the financial ability of the purchaser, by reason of the fact that they prevented the broker from testifying as to his willingness to help the purchaser.

APPEAL from a judgment of the Superior Court of Fresno County. H. Z. Austin, Judge. Reversed.

The facts are stated in the opinion of the court.

Harry Sarkisian for Appellants.

F. W. Docker, G. L. Aynesworth and Astor Elmassian for Respondent.

LAWLOR, J.—This is an appeal by the defendants, L. Kludjian, S. Kludjian, and the said L. Kludjian and S. Kludjian, doing business as Kludjian Bros., from a judgment in favor of the plaintiff, A. Merzoian, in an action

2. Default of principal in entering into or carrying out contract with purchaser as affecting broker's commissions, note, 43 L. R. A. 593.

brought to recover commissions which plaintiff alleged he had earned in securing for the defendants a purchaser for certain real estate which they owned and which they had employed him as agent to sell on a commission of five per cent. The record of the appeal is presented under the alternative method.

On January 16, 1917, the defendants authorized the plaintiff in writing to sell a tract of forty acres of land in Fresno County, together with certain personal property consisting of agricultural implements, livestock, and other accessories used on the ranch. The selling price of this property was to be twenty thousand five hundred dollars, payable as follows: "Five thousand dollars cash. Balance one thousand dollars per year and interest." It is alleged in the complaint that on or about January 27th the plaintiff found a purchaser who agreed in writing to buy upon the owners' terms and deposited with the plaintiff the sum of one hundred dollars; that thereafter and prior to February 2d plaintiff duly notified defendants that he had effected a sale of the property; that the proposed purchaser and the defendants were brought together for the purpose of consummating the sale; "that said purchaser did then and there . . . offer to purchase . . . the property"; that the defendants thereupon refused to make the sale; that the defendants had agreed to pay the plaintiff "a five per cent commission on the selling price" of twenty thousand five hundred dollars, and that the plaintiff, having produced a purchaser who was ready, able, and willing to buy, is entitled to the commission. Judgment was rendered in accordance with the prayer of the complaint for $1,025.

Appellants raise three questions: "First and foremost of which is whether the prospective purchaser . . . was ready, willing, and able to purchase . . . Second. Whether the defendants could have obtained a valid and binding contract from the prospective purchaser . . . , and Third. Whether the prospective purchaser was produced as such during the life of the contract of employment of the agent and before revocation of the same."

1. We shall first consider whether John Hatchegian, the prospective purchaser, was ready, able, and willing to make the purchase, and whether the defendants could have obtained a contract from him. In this connection the court

found "that at all times said John Hatchegian was ready, able, and willing to purchase said property." Is this finding sustained by the evidence? Hatchegian testified on direct examination: "Q. About the latter part of January, 1917, did you have any conversation with Mr. Merzoian? A. Yes, sir. . . . On I Street. . . . It was further said, he asked me five thousand dollars for cash payment, and I said I didn't have five thousand dollars. I told him I only had two thousand dollars cash and there was another party, named Avadisian, said he was willing to lend five hundred dollars more. . . . Mr. Merzoian said at that time, 'In case Avadisian does not loan you five hundred dollars, I am willing to help you with three thousand dollars so you can purchase the place.' . . . Q. Did you have any money in the bank or any place at that time? A. I had a thousand dollars in the Bank of Italy, and about seventeen or sixteen hundred dollars in the First National Bank of Fresno. Then, aside from that, I had another note which was due right away, four hundred dollars. Q. And all together, then, you had in the neighborhood of two thousand dollars or two thousand five hundred dollars, didn't you? A. I had two thousand five hundred dollars. I had two thousand five hundred dollars, and Mr. Avadisian was supposed to give me five hundred dollars. . . . I went down and saw the cashier of the First National Bank, . . . Walrond. I asked him if they were willing to give me five hundred dollars. They said, 'Yes, if you get a couple of fellows to sign on your note.' . . . Mr. Merzoian at that time had a note for three thousand dollars, and he says his commission would amount to a thousand dollars, that he would deposit the three thousand dollars in the bank and would get two thousand dollars and give it to me." On cross-examination, he gave the following testimony: "Q. Now, did Avadisian ever have any conversation with you at any time before this particular conversation you have spoken of, wherein he promised to loan you five hundred dollars? A. Yes, lot of other occasions; many times. . . . He has said on many occasions if I were to buy the place he would lend me five hundred dollars. . . . Q. Did you at that time, or at any other time since, agree as to when you should return that five hundred dollars to him? A. At any time I had money I was going to pay him back. Q. Is

Mr. Avadisian related to you by blood? A. Godfather to my children. . . . Q. At the time you signed this paper [his agreement with Merzoian for the purchase of the property] you had one thousand dollars on deposit in the Bank of Italy, did you? A. Yes, sir. Q. How much money did you have on deposit in the First National Bank of Fresno? A. I don't remember correctly; it might be six hundred dollars or five hundred dollars, I don't know just exactly; and I had a note for four hundred dollars. Q. Do you mean to tell me that on the twenty-seventh day of January, 1917, the day you signed this agreement, you had one thousand dollars on deposit in the Bank of Italy? . . . A. Yes, sir. Q. And you had five hundred dollars or six hundred dollars at the same time . . . in the First National Bank of Fresno, did you? A. Why, I don't know; five or six, I don't know; I don't remember whether it was five hundred dollars or six hundred dollars that I had. . . . That is all I had in money, a thousand dollars in the Bank of Italy, and five or six hundred dollars in the First National Bank. . . . I had two lots, deeded to my wife. . . . That is all I had. . . . At that time and now I had two thousand dollars, my personal money, and Avadisian was going to lend me five hundred dollars. That is how I make two thousand five hundred dollars. . . . Q. You speak of a four hundred dollar note. Who was that given to you by? . . . A. One Michael Jacob. He has got eighty acres at Lone Star and forty acres on California Avenue. The nature of that note was so that I could demand my money at any time that I need it. The Court: Ask him if he ever borrowed that five hundred dollars from Mr. Avadisian. A. No, I didn't borrow at that time. . . . Q. How much did Mr. Merzoian promise to help you? A. He said, 'I am willing to help you from two thousand five hundred dollars to three thousand dollars.' Q. Did he loan you two thousand five hundred dollars to three thousand dollars at any time? A. No, he did not.''

W. A. Piper, bookkeeper at the First National Bank of Fresno, testified that there had never been an account at that bank in the name of John Hatchegian.

The plaintiff succeeded in bringing together at the office of his attorney, Astor Elmassian, the defendants and the prospective purchaser, John Hatchegian. On direct exami-

nation the plaintiff testified as follows regarding this interview: "Q. Now, what was said at this meeting at Mr. Elmassian's office? . . . A. Mr. Elmassian was present over there, and there was Mr. Kludjian brothers, Serop and Leon Kludjian, and Mr. Hatchegian, he like to buy the place, . . . I gave them the one hundred dollars, told them, 'That is your deposit.' They said no, they won't take it; they don't like to sell. . . . Kludjian brothers said they don't like to sell at all; they said, 'We have trouble with my brother; we don't like to sell the place.' Q. Was there anything said at that time about furnishing an abstract of the place? A. No. . . . We said about that, but they said they don't like to sell." On cross-examination, he further testified as to what was said at this interview: "I talk about selling his place. That is all I told him [Kludjian]. I told him I got customer. . . . They say they don't like to sell. That is all I know."

Regarding the same meeting in his office, Elmassian stated: "When Mr. Hatchegian and Kludjian brothers and Mr. Merzoian came in, Mr. Merzoian told the Kludjian brothers that he had sold their property and got a deposit from Mr. Hatchegian of one hundred dollars, and that he wanted them to bring the abstract so the contract could be drawn up and conclude the business, and then he says Mr. Hatchegian had agreed to pay the five thousand dollars and one thousand dollars a year, and to that, as I believe, the older of the Kludjian brothers said they would not sell. . . . He said they would not sell because they had had trouble with the other brother, who had not signed the contract. . . . Q. Now, . . . did Mr. Hatchegian make any statements . . . to Kludjian brothers? A. Yes, he said he wanted to buy the place and pay five thousand dollars cash and one thousand dollars a year, but the elder brother of the Kludjian brothers said they would not sell." He testified as follows on cross-examination: "Q. On the meeting at your office . . . Hatchegian had made an offer to buy that place, hadn't he? A. Yes. Q. And the Kludjians had refused to make the sale? A. Yes, sir. . . . It appeared that they would not sell the place. They went out and they were mad; and that was the whole—the final transaction. . . . Q. Then they absolutely—in your conversa-

tion—absolutely refused, said, 'No, we are not going to sell?' A. They did.''

*Mattingly* v. *Pennie,* 105 Cal. 514, [45 Am. St. Rep. 87, 39 Pac. 200], was an action to ·recover commissions for the sale of mining stock. The plaintiff alleged that by a written contract he had been authorized to negotiate a sale of stock belonging to defendant's intestate; that he had a purchaser who was ready, able, and willing to buy, and that the defendant's intestate had refused to sell. The court, reversing the judgment of the lower court in favor of the plaintiff, said, at page 522: ''The evidence is also insufficient to show that the supposed purchaser had the ability to ·purchase the stock at the price named. The only evidence on that point is his own testimony. . . . That testimony amounted to nothing more than a statement of his belief that persons not bound by contract to do so would have advanced the money; and it is clearly not such evidence as, under section 1835 of the Code of Civil Procedure, would justify the jury in finding that he had the ability to pay.'' *McCune* v. *Badger,* 126 Wis. 186, [105 N. W. 667], was an action to recover a commission for the sale of real estate alleged to have been earned by plaintiff. The trial court directed a verdict for· the defendant. We quote from the opinion of the court: ''We are unable to find any reasonably clear evidence that appellant found a purchaser able and willing to take respondent's property and pay therefor the amount in cash which it is conceded she was to have. . . . The most appellant claims he accomplished was to produce a person willing to take the property so that respondent could realize her price upon condition of appellant's furnishing or procuring the money necessary therefor in excess of two thousand dollars, and that he had promise of loans to enable him to do so. He did not pretend his party was ever in circumstances to accept a deed of the property and pay the required amount of money therefor, except upon condition that certain persons, who had promised to loan the money to him on the property, redeemed the promise. . . . The arrangement claimed to have been made contemplated the passing of the title to the property to the proposed purchaser in order to enable him or the appellant to borrow money thereon with which to pay therefor.''

[1] In the instant case, the evidence we have quoted (and no other evidence was introduced as to the alleged readiness, ability, and willingness of the prospective purchaser), considered in the light most favorable to respondent, shows that Hatchegian had one thousand dollars in the Bank of Italy, five hundred dollars or six hundred dollars in the First National Bank of Fresno, a demand note for four hundred dollars, and the verbal promises, made without any consideration therefor, of Avadisian and the plaintiff to lend him five hundred dollars and two thousand dollars, respectively. Hatchegian, as we have seen, admitted that he had not borrowed the money from Avadisian or the plaintiff. He testified that he had "two lots deeded to my wife," but he did not state whether he could have borrowed money on that property. Moreover, it cannot be said that his testimony is at all certain as to his available assets, and, as we have shown, an official of one of the banks in which he asserted he had money on deposit stated that they had never had an account there in his name. In our opinion, the facts clearly fall within the rule announced in *Mattingly* v. *Pennie, supra,* and *McCune* v. *Badger, supra.*

Respondent cites *McCabe* v. *Jones,* 141 Wis. 540, [124 N. W. 486], an action by a real estate broker to recover commissions for negotiating a sale of real property, where the evidence was held sufficient to sustain a finding that the purchaser procured by the plaintiff was "able" to make the purchase. In that case "the parties agreed that if plaintiff would induce Leach to purchase defendant's farm and personal property at the price of thirteen thousand dollars and pay therefor seven thousand dollars in cash and convey by good title Leach's residence property in Oshkosh, free of encumbrance, defendant would sell at that price and would pay plaintiff two hundred fifty dollars." The court declared: "The trial judge reversed the answer to the second question because in his judgment the evidence was conclusive that Leach was not ready, able, and willing to make the trade and the only question in the case is whether this ruling is correct. The evidence on this question was substantially as follows: Leach's homestead in Oshkosh was subject to a mortgage of two thousand dollars. Leach testified *that he owned ten thousand dollars' worth of unencumbered property* in Oshkosh *outside of his home-*

*stead;* that he *arranged* with one Elmer Clark to let him have *seven thousand dollars upon mortgage* on the Jones [defendant's] farm at the time the papers should be exchanged; *that he had also provided to turn over his homestead clear of encumbrance;* that these arrangements were *complete* before and at the time when the trade was to be completed. Clark testified that, in accordance with Leach's request, he had the seven thousand dollars ready in hand to loan to Leach on the Jones farm, and kept the money ready for two months. . . . *There was no evidence to contradict this testimony of Leach and Clark, nor was there any evidence tending to throw doubt upon their good faith or upon the ability* of either of them to carry out the arrangements which they testified they were ready and willing to carry out." In our opinion, the facts which we have italicized are clearly distinguishable from those in the case at bar.

[2] It appears from the evidence, which we have already set forth, that the appellants' refusal to sell to Hatchegian was made before he had an opportunity to show whether he was able to make the cash payment of five thousand dollars, and that such refusal could not have been based upon the asserted inability of Hatchegian to complete the purchase. This refusal to proceed with the transaction rendered it unnecessary for Hatchegian to tender the cash required to bind the sale (9 Corpus Juris, p. 600, and cases there cited). This point, however, is not urged by the respondent. His brief is devoted, principally, to a discussion of appellants' contention as to the insufficiency of the evidence to show that Hatchegian was ready, able, and willing to make the purchase.

Respondent claims that the appellants are precluded from questioning the sufficiency of the evidence as to the financial ability of Hatchegian so far as it is affected by the repondent's willingness to extend him credit in making the initial payment. We quote from the direct examination of the respondent: "Q. Did you, Mr. Merzoian, make any statement about being willing to help Mr. Hatchegian purchase the place? A. Yes, sir. Q. And did you make it at that time? A. Yes, sir. Mr. Sarkisian [Attorney for the defendants] : Now, if your honor please, we object to that; that is only a matter of defense. The Court: That is right.

Mr. Sarkisian: Please, your honor, that is anticipating the defense. The Court: Perhaps the prospective purchaser would be the most competent to testify to his ability to pay. I think perhaps we had better wait for that.'' 'With regard to this ruling respondent's contention in his supplemental brief thus states his position: "The ground upon which the objection of defendant was made and upon which the court ruled out this evidence was that the matter was properly one of defense; that it was rebuttal only and could not be introduced as a part of the plaintiff's original case; that the burden was on the defendants to prove the contrary, and that in the absence of such proof it would stand admitted that the persons who had offered to loan Hatchegian money to make this purchase . . . were able to make their promises good. Having prevailed upon this theory and kept out all evidence for the plaintiff upon this point, he cannot now be heard to complain that the trial court applied his theory consistently and gave judgment against him without any evidence upon this point to sustain its findings.'' The respondent does not contend that the exclusion of this testimony constituted error. It may be observed, however, since the judgment must be reversed and the cause remanded for a new trial, that it was a part of the plaintiff's case in chief to show that Hatchegian was ready, able, and willing to make the purchase, and this could be done by proof either that he had the funds in hand, in whole or in part, or that he commanded resources upon which he could obtain the requisite credit. What respondent does contend is that appellants are precluded from asserting that the evidence is insufficient to show that Hatchegian was financially responsive. **[3]** We do not think this contention can be sustained. Hatchegian himself did not have sufficient funds. He was relying in part upon credit. From what we have already said, it is plain that his resources consisted, apart from the one thousand dollars in the bank and the four hundred dollar note, not of tangible credits, but of unenforceable promises. It is not even claimed that he had a promise from his wife to convey to him the two lots which he declared stood in her name. It was upon these considerations that we reached the conclusion that the evidence does not support the findings that

plaintiff produced a purchaser who was ready, able, and willing to buy the property.

2. In view of the insufficiency of the evidence, it will not be necessary to discuss the third question presented by appellants—whether the contract of agency was revoked before the plaintiff produced the purchaser. Judgment reversed.

Shaw, J., Olney, J., Lennon, J., and Wilbur, J., concurred.

ANGELLOTTI, C. J., Dissenting.—I dissent, for the reason that I am of the opinion that the evidence sufficiently supports the finding of the trial court that the proposed purchaser was "ready, able, and willing to purchase said property upon the terms and conditions set forth in said instrument."

Rehearing denied.

All the Justices concurred.