KERRIGAN, J.
 

 On April 7, 1964, the plaintiff Am-Cal Investment Co., Inc., a California corporation, which is owned solely by its president Louis Weinberg, entered into a written agreement with the defendant Sharlyn Estates, Inc., a California corporation, wherein the plaintiff agreed to purchase, and the said defendant agreed to sell, 6.589 acres of raw land located on Tustin Avenue in the City of Orange, for the sum of $38,500 an acre, comprising a total purchase price of $253,-676.50. The agreement provided that the purchase price would be payable in the following manner: $5,000 in cash on execu
 
 *527
 
 tion of the agreement, and the entire balance of $248,676.50 to be payable within 90 days, to wit, on or before July 7, 1964.
 

 Weinberg, the president of the plaintiff-corporation, intended to borrow the funds required to pay the balance of the purchase price. In the early part of June 1964, Weinberg requested that the defendant-seller Sharlyn execute a new escrow agreement extending the time for the payment of the balance of the purchase price inasmuch as Weinberg had not yet been successful in securing the financing required to effect the payment of the balance of the purchase price, and for the further purpose of enabling the buyer to obtain a zoning change whereby the entire parcel could be utilized for commercial development.
 

 On or about June 10, 1964, for an additional $10,000 cash consideration, the plaintiff-corporation and the defendantSharlyn entered into a new escrow agreement relating to the purchase and sale of the identical property for the same price, which escrow agreement provided that the buyer would have 90 days from and after July 7, 1964, in which to pay the balance of the purchase price in the sum of $248,676.50. The following express provisions are embodied in the agreement:
 

 “. . . [TJime is of the essence of this agreement . . . “Automatic Cancellation : Should the Purchaser not perform all the terms and conditions of this agreement, said agreement shall automatically be cancelled at a date from and after Ninety-one (91) days from and after July 7, 1964 . . . .” “Extension: Notwithstanding the previous terms and conditions of this agreement, it is the intent of the Seller and Purchaser that the Purchaser may extend the final closing date of this agreement for an additional thirty (30) days from and after the date, which is ninety (90) days from and after July 7, 1964. Any requests for an extension under this Article must be in writing and signed by the Purchaser, directed to the Seller and delivered to the Seller not later than ninety (90) days from and after July 7, 1964. The Seller shall be obligated to grant the request for said thirty (30) day extension upon a showing of good cause by the Purchaser herein why said extension should be granted.”
 

 In July-August 1964, following the execution of the new escrow agreement, Weinberg submitted a loan application to Keston J. Deimling, a loan broker and appraiser, in the sum of $325,000. The contemplated loan was to be secured solely by the land involved and the financial resources of the prinei
 
 *528
 
 pals of the plaintiff-corporation. On July 23, 1964, Weinberg and Deimling also joined together in an application to the City of Orange for a zoning change to C-l. Deimling informed Weinberg that a loan commitment could be obtained within 30 days of the completion of the zoning change. A change of zone was later consummated on September 22, 1964, whereby the entire parcel was zoned C-l.
 

 After being retained by Weinberg for the purpose of negotiating a loan in the sum of $325,000, Deimling engaged the services of a loan consultant, Michael J. Duncan. Deimling delivered the loan application, an appraisal of the property, a plot plan, and Weinberg’s financial statement to Duncan. In turn, Duncan submitted the loan application to Lincoln Mortgage Company, Wichita, Kansas, another brokerage firm.
 

 On September 30, 1964, with rezoning of the entire parcel having been completed, but with no loan commitment having been negotiated, plaintiff requested a 30-day extension of the defendant-Sharlyn pursuant to the terms of the contract of sale. On October 1, 1964, the defendant-Sharlyn refused to grant the extension. On October 6,1964, the plaintiff filed this specific performance action and placed a
 
 lis pendens
 
 on the property, thereby electing to treat Sharlyn’s refusal to grant the extension as an anticipatory breach, and for the obvious purpose of protecting its rights under the contract inasmuch as the 90-day time period provided therein was due to expire on October 7,1964.
 

 Notwithstanding the notice of action accomplished by the lis pendens, the defendant-Sharlyn deeded the entire acreage to the defendant-Newell Fait for the sum of $253,676.50, the identical purchase price which Sharlyn was to have received from the plaintiff. Fait is consequently a third-party purchaser of the property subject to, and with notice of, the present litigation.
 

 The evidence is undisputed that on September 30, 1964, the date on which Weinberg asked for the 30-day extension of time, that neither he nor the corporation had the necessary funds to close the escrow. The evidence is further clear that the buyer lacked funds to close the escrow on October 6, 1964, the day the complaint for specific performance was filed, and supplementally, that the plaintiff had no funds on October 7, 1964, the initial date for the closing of the escrow. However, the trial court entered a finding, based on conclusive evidence, that plaintiff’s letter of September 30,1964, requesting the 30-day extension, constituted “good cause” for the extension
 
 *529
 
 inasmuch as the phrase “good cause” was defined and used by the parties to mean that the extension would be granted “if needed or if necessary.” Thus, while the defendant-seller took the position during trial that it was justified in not granting the extension, it is now fairly conceded that Sharlyn and its purchaser-Fait are bound by the trial court’s finding inasmuch as there was credible evidence indicating “good cause” for the extension and, consequently, the plaintiff-buyer had until November 6, 1964, to complete its obligations under the escrow agreement.
 

 The trial court’s findings that the defendant-Sharlyn committed an anticipatory breach of the contract and that the defendant-Fait took with notice of the agreement and notice of the anticipatory breach are similarly undisputed.
 

 The cardinal issue during trial and on appeal is whether plaintiff was financially able and ready to pay the purchase price within the time required by the agreement to sell. A corollary issue is whether a buyer seeking specific performance need only prove ability to pay the purchase price at the time of trial, as distinguished from ability to pay the purchase price during the period provided in the contract.
 

 At the commencement of the trial on April 1, 1965, the defendants moved for a judgment on the pleadings on the ground that the complaint failed to contain an allegation to the effect that the plaintiff was “ready, willing and able” to perform all of its obligations under the land-sale contract. The trial court granted plaintiff’s motion to amend the complaint by insertion of the additional allegation that plaintiff was “ready, willing and able” to perform all of its obligations under the land-sale contract, and then denied defendants’ motion for judgment on the pleadings, whereupon the case proceeded to trial. At the conclusion of the plaintiff’s ease, defendants moved for judgment under section 631.8 of the Code of Civil Procedure, and the court granted the motion. The motion was based on the alleged failure of plaintiff to prove, notwithstanding the anticipatory breach committed by the defendant-seller, that plaintiff was ready, willing and able to perform on November 6, 1964. Plaintiff promptly moved to reopen, which motion was granted, and the trial was continued to April 6,1965.
 

 At the conclusion of defendants’ case, the court announced judgment for the plaintiff, and findings of fact and conclusions of law and a judgment were thereafter entered decreeing
 
 *530
 
 specific performance. The defendants objected to the findings and moved for a new trial, the main grounds of the motion for new trial being newly discovered evidence relative to the financial ability of plaintiff’s lending agency to advance the balance of the purchase price. The defendants, in support of their motion for a new trial, submitted numerous affidavits, the import of which indicated that plaintiff’s lender did not have the financial ability to effect the loan to the plaintiff. The court thereupon vacated the decree of specific performance and reopened the cause pursuant to the provisions of section 662 of the Code of Civil Procedure for the limited purpose of trying the issue of plaintiff’s readiness, willingness, and ability to perform its obligations under the contract following the repudiation thereof by the defendant-seller. The cause was continued for three months at the request of defense counsel. Shortly before the expiration of said period, the defendants again moved for a continuance, and the cause was continued for two months. On October 15, 1965, the defendant-Fait again moved for a 90-day continuance. Defense counsel indicated that the only reason for the continuance was to permit counsel to take the deposition of a recalcitrant witness. Plaintiff opposed the final motion for continuance inasmuch as it had a loan commitment for the purchase of the property which could be cancelled at any time, and on the further ground that all information available indicated that the reluctant witness would resort to the constitutional privilege against self-incrimination. The court then denied the motion for continuance, and the trial continued on October 18, 1965. The trial concluded shortly thereafter, with the court ordering specific performance of the contract.
 

 Following the trial court’s action in granting plaintiff’s motion to reopen the case to present additional testimony regarding plaintiff’s financial abilits^, Duncan, the loan consultant to whom Weinberg’s loan application had been forwarded by the loan broker Deimling, was called as a witness for the purpose of testifying as to whether a loan commitment had been secured upon plaintiff’s behalf. Over objection of defense counsel that the testimony was inadmissible hearsay, the trial court itself elucidated testimony from Duncan to the following effect: That on October 15, 1964, a letter of commitment was delivered to him for delivery to Mr. Weinberg; the lender issuing the letter of commitment was Authorized Investors Trust of Oklahoma City, Oklahoma; that an
 
 *531
 
 Authorized official signed the letter of commitment whereby the firm offered a loan to Weinberg of $325,000; that he did not keep or make a copy of the commitment letter and the letter was never delivered to Weinberg.
 

 As previously noted, the court elicited the salient testimony relating to the letter, and inasmuch as such testimony is clearly hearsay, it is reproduced verbatim herein :
 

 “The Court: Do you have any independent recollection now as to what was contained in that document ?
 

 “The Witness: As I remember it, it was the normal land loan requirements, such as the proper release clauses, and the marketable title, and subject to the—several things that were just normal, in a
 
 take-out letter,
 
 or stand-by letter, in that venture.
 

 “The Court: Do you remember to what extent, if any, the investor stated that it would pay any sums of money ?
 

 I ‘ The Witness : $325,000.
 

 II The Court : On what conditions ?
 

 “The Witness: Well, had they met every condition in the letter, they would fund it through a loan escrow, $325,000. And it would be obtained—secured by a first loan
 
 [sic]
 
 of trust. ’ ’
 

 Following Duncan’s testimony on April 6, 1965, and the initial action of the court in announcing judgment for the plaintiff whereby it decreed specific performance, the defendants moved for a new trial, which motion, as heretofore indicated, resulted in the reopening of the cause.
 

 On August 18, 1965, trial was again resumed and defense testimony was presented concerning Authorized’s financial ability. The evidence indicates that Authorized was organized in
 
 1963
 
 at Oklahoma City, Oklahoma; that its original capitalization was $10; that its trustee was Robert Muller; that Authorized had a commercial banking account at Fidelity National Trust Company in Oklahoma City, Oklahoma, which was opened April 24, 1964, and closed on January 20, 1965; that between September 11, 1964, and November 17, 1964, cheeks totaling a sum in excess of $12,000 drawn on Authorized’s commercial account were dishonored on the basis of insufficient funds.
 

 Suffice it to say, there was no evidence of any other source of possible loan funds to be provided plaintiff by Authorized or its loan agent, Lincoln Mortgage Company, Inc., the loan brokerage company to which Weinberg’s loan application had
 
 *532
 
 been referred by Duncan. The testimony of the officials of Lincoln Mortgage Company established: that said firm seldom lent its own money and customarily operated only as a loan broker; that in this particular transaction Lincoln was not acting as a lender, but was acting as loan broker for Authorized ; that Lincoln never offered Weinberg or the plaintiff any commitment pursuant to which Lincoln would be bound to lend money to Weinberg or his corporation; that Lincoln did not have in its files either a copy of the Authorized letter of commitment, which Duncan testified he returned to Lincoln Mortgage, or any other record of any kind relating to the purported loan commitment from Authorized to Weinberg; that Lincoln officials had no knowledge of the purported Authorized letter of commitment to the plaintiff-buyer; that Lincoln officials knew of no instance wherein Authorized had loaned as much as $100,000 of its own money, although it was possible Authorized had a “back-up commitment” from another party or lending institution; that Lincoln customarily destroyed all documents whenever a loan transaction fell through; and finally, that if there were any documents such as a loan commitment letter from Authorized to Weinberg in existence, such letter would be in the custody of Duncan.
 

 It should be particularly noted that in his hearsay description of the commitment letter Duncan described it as a “ takeout letter.” Witnesses called by both sides agreed in their testimony that the term “take-out” letter signifies a loan commitment for long-term financing of commercial or industrial property. The “take-out” loan is used to repay short-term or interim financing by a bank or other lending institution which advances funds to the purchaser to buy land for development. “Interim financing” is usually a loan of purchase money and money advanced for construction purposes for a relatively short term, varying in point of time from six months-five years. Contrastingly, a “take-out” loan is not purchase money; it is an agreement on the part of another institutional lender to “take-out” the short term loan by taking over the financing of the project at the expiration of the interim financing; a “take-out” commitment is one to loan money in the future, after land has been already purchased.
 

 Notwithstanding his testimony that the commitment was a “take-out” loan offer, Duncan then recounted that the funds
 
 *533
 
 from Authorized would have been available to the plaintiff for utilization in the purchase of the property 30 days after Weinberg’s acceptance of the letter of commitment, which would simply mean that in the event that Authorized had financial resources sufficient to enable it to make the loan, that the money would have been available to the plaintiff no earlier than November 15, 1964, which was 9 days following the November 6, 1964, extended deadline for closing the escrow.
 

 Defendants offered to impeach Duncan’s testimony that Authorized offered a purchase-money loan of $325,000, but the offer was rejected by the court on the grounds of hearsay. The impeaching testimony which was offered by the defense consisted of the following: That Eobert Muller, Sr., a trustee of Authorized Investors Trust, orally informed Mr. Hitt, the defendants’ witness, that the purported letter of commitment from Authorized Investment Trust to the plaintiff had never been issued; that Authorized Investment Trust had merely offered to issue plaintiff a letter of commitment which would have obligated Authorized at the end of 18 months following the date of the letter of commitment to purchase a promissory note made by plaintiff in the amount of $325,000, secured by a deed of trust on its property in Orange, California.
 

 During the course of the reopened trial, plaintiff was permitted to introduce evidence of a loan commitment from Ahmanson Bank and Trust Company of Beverly Hills, which loan commitment was made on March 26, 1965. The purpose of the testimony was to demonstrate that plaintiff could have paid the purchase price on November 6, 1964, as well as to prove the ability of the plaintiff to pay the purchase price at the time the trial commenced on April 1, 1965. The testimony of the Ahmanson Bank loan commitment may be summarized as follows: Ahmanson made a loan commitment on the subject-property on the basis of a joint application submitted by Weinberg, David Seigel, Jerome Seigel, Edwin Seigel, Sanford Seigel, and A. J. Weiss; the Seigels, Weiss, and one Hartock agreed to help with the financing of the 6% acres involved herein in consideration of Weinberg’s assignment to them of one-half of plaintiff’s interest in the real property; in making the loan commitment, Ahmanson Bank relied upon the joint financial statements and financial resources of Weiss and the Seigels; Ahmanson was not furnished with the financial statement of the plaintiff-corporation; the amount of the loan application was in the sum of $350,000; Weinberg’s assets
 
 *534
 
 were only $167,000, but the combined worth of all the joint applicants was $3,000,000-$4,000,000; although the bank intended to take a trust deed on the real estate as partial security for the loan, the bank relied essentially upon the personal responsibility of the joint applicants, and not on the basis of a lien upon the real estate; in the event an application for a loan had been made by the same parties between October 7 and November 6, 1964, then the Ahmanson Bank would have made the same loan commitment in 1964; however, in the event Weinberg individually had applied for such a loan in 1964, such a loan commitment probably would not have been given.
 

 In further support of the Ahmanson loan commitment, A. J. Weiss, who is the personal attorney for the Seigel interests, and who also signed the joint loan application with the Ahmanson Bank, testified: That he is general counsel for the Riviera Furniture Company owned by the Seigels; that he arranged for the loan commitment from the Ahmanson Bank; that he first met Weinberg in late 1964, but did not discuss the financing of the subject property with Weinberg until March 1965; that said discussion culminated in the obtaining of the Ahmanson loan commitment just prior to the trial.
 

 The effect of the proof with respect to the Ahmanson loan commitment is that funds would have been available to the plaintiff, its president Weinberg, and the other joint applicants to purchase the real property
 
 at the time the trial commenced
 
 in April 1965. The trial court thus entered a finding that the evidence of the Ahmanson Bank commitment represented sufficient proof of the financial ability of the plaintiff-buyer at the time of performance based on the probability that Ahmanson Bank would have made the loan in November 1964 in the event an application for the loan had then been submitted.
 

 The facts clearly demonstrate that the defendantSharlyn repudiated the contract to convey real property by selling the area comprising some 6% acres to the defendantFait while the escrow was still pending between the plaintiff-corporation and the defendant-Sharlyn. The act of the defendant-Sharlyn in conveying the land to the defendantFait during the 30-day extension period constituted an anticipatory breach of contract. (See Civ. Code, § 1440.) . It is similarly manifest that the plaintiff-buyer never deposited the balance of the purchase price in escrow during the period
 
 *535
 
 provided in the contract, and that the agreement of sale provided that “time is of essence” of the contract. Generally, under such circumstances “ [n] either party to such a contract can place the other in default unless he is able to perform or tender performance.”
 
 (Brant
 
 v. Bigler, 92 Cal.App.2d 730, 733 [208 P.2d 47];
 
 Weaver
 
 v.
 
 Casad,
 
 86 Cal.App.2d 593 [195 P.2d 81].)
 

 However, upon a proper showing, a plaintiff-purchaser can place the defendant-seller in default and obtain specific performance despite his own failure to deposit the purchase money in escrow, if there has been an unwarranted repudiation by the defendant-seller and plaintiff-buyer satisfies the requirements of equity. “ [A]n essential basis for the equitable remedy [of specific performance] must be a showing by the plaintiff of performance, or tender of performance, or ability and willingness to perform.”
 
 (Cockrill
 
 v.
 
 Boas,
 
 213 Cal. 490, 492 [2 P.2d 774]; Civ. Code, §§ 1439, 3392.) A buyer seeking specific performance of a contract for the sale of realty has the burden of both pleading and proving that he was ready, willing and able to perform the contract.
 
 (Cockrill
 
 v.
 
 Boas, supra; Buckmaster
 
 v.
 
 Bertram,
 
 186 Cal. 673, 678 [200 P. 610].) Where plaintiff’s action for specific performance is based upon defendants’ breach by anticipatory repudiation, plaintiff must still show that he was ready and able to perform; the only effect of the repudiation is to excuse the plaintiff from the usual duty of making a tender.
 
 (Beverage
 
 v.
 
 Canton Placer Min. Co.,
 
 43 Cal.2d 769, 777 [278 P.2d 694] ;
 
 Merzoian
 
 v.
 
 Kludjian,
 
 183 Cal. 422, 429-431 [191 P. 673]; Corbin, Contracts, § 978; Rest., Contracts, § 306.) While the positive repudiation of a contract of sale by the vendor excuses the vendee from a formal tender of the price as a condition precedent to an action for specific performance, it does not obviate the necessity of stating in his complaint in such action that he is ready, able, and willing to pay the amount due.
 
 (Buckmaster
 
 v.
 
 Bertram,
 
 supra; see also
 
 Dotson
 
 v.
 
 International Alliance etc. Employes,
 
 34 Cal.2d 362, 372 [210 P.2d 5]; 4 Pomeroy, Equity Jurisprudence (5th ed. 1941), p. 1051.)
 

 A purchaser without funds of his own may show that he was ready and able to pay the purchase price because he had made arrangements to borrow the required funds from a lending institution or from a third party, but if he relies upon the negotiation of a loan from a third party, the buyer must
 
 *536
 
 prove: (1) That the third party was legally hound by contract to advance the funds
 
 (Merzoian
 
 v.
 
 Kludjian, supra,
 
 183 Cal. 422,
 
 429-431;
 
 and (2) 11. . . that the party offering to advance the [purchase price] has the financial ability so to do . . .
 
 (Cameron
 
 v.
 
 Ayres,
 
 175 Cal. 662, 665-666 [166 P.
 
 801]; Pellaton
 
 v.
 
 Brunski,
 
 69 Cal.App. 301, 304 [231 P. 583].)
 

 The evidence herein clearly establishes that neither the plaintiff-corporation nor Weinberg, the president and sole owner of the plaintiff-corporation, had the necessary funds to purchase the property. The issue then arises whether there is sufficient evidence to prove that the plaintiff was financially able to pay the purchase price from the funds offered by the two lending institutions, Authorized Investors or Ahmanson Bank, within the time required by law. It should be emphasized that there is no evidence that the defendant-Sharlyn’s repudiation resulted in the plaintiff being unable to obtain the necessary funds to pay the purchase price within the time required by the contract. The plaintiff admittedly lacked funds of its own, and there was no causal relation between the repudiation and the lack of funds. Furthermore, the repudiation did not prevent the plaintiff from seeking a loan to finance the purchase price prior to November 6, 1964. Consequently, the rule that specific performance may be allowed where the inability to obtain a loan for the purchase price is caused by the seller’s repudiation because the lender can-celled the loan by reason of the repudiation is not applicable under the facts presented herein. (See
 
 Reinink
 
 v.
 
 Van Loozenoord,
 
 370 Mich. 121 [121 N.W.2d 689].)
 

 There appears to be a clear lack of credible or admissible evidence that Authorized had the financial ability to make a loan in the sum of $325,000. No testimony was introduced of the purported lender, Authorized Investors, to prove that a loan commitment had been made and that Authorized enjoyed the financial ability to honor the commitment. While testimony was elucidated through the loan broker Duncan as to his recollection of the contents of a letter of commitment which Duncan stated he had received from Authorized, such letter was never produced. Such testimony constituted hearsay evidence because it was manifestly received for the purpose of proving the truth of Authorized’s alleged financial ability to loan the sum of $325,000. Hearsay evidence is evidence of a statement that was made other than by a witness
 
 *537
 
 while testifying at a hearing, and that is offered to prove the truth of the matter stated; except as provided by law, hearsay evidence is inadmissible. (Evid. Code, § 1200, formerly Code Civ. Proc., § 1845.) One judicially created exception to the hearsay rule is stated in Witkin, California Evidence (2d ed. 1966), § 463, p. 425 : “There is a well-established exception or departure from the hearsay rule applying to cases in which the very fact in controversy is whether certain things were said or done and not as to whether these things were true or false, and in these cases the words or acts are admissible not as hearsay, but as original evidence.”
 
 (People
 
 v.
 
 Henry
 
 (1948) 86 Cal.App.2d 785, 789 [195 P.2d 478]; see also
 
 People
 
 v.
 
 Rosson,
 
 202 Cal.App.2d 480, 486-487 [20 Cal.Rptr. 833].) In these situations, the words themselves, written or oral, are “operative facts,” and an issue in the ease is whether they were uttered or written.
 
 (People
 
 v.
 
 Bosson, supra.)
 
 The plaintiff cites
 
 Young
 
 v.
 
 Benton,
 
 21 Cal.App. 382, 390 [131 P. 1051], and
 
 Bank of America
 
 v.
 
 Taliaferro,
 
 144 Cal.App.2d 578, 581 [301 P.2d 393], to indicate that Duncan’s testimony falls within such exception. However, this exception to the hearsay rule is not applicable to the facts of this case. The letter, if introduced, would not have been admitted simply to indicate that an offer had been made. It would have been admitted to show the truth of the proposition therein stated, i.e., that Authorized had and was willing to lend Weinberg the purchase money for the land.
 

 The trial court described the hearsay as “flimsy” evidence, but nevertheless admitted it to prove the critical issue involved in the trial, which issue related to the plaintiff’s financial ability to perform the contract by reason of having the necessary loan commitment from Authorized to pay the purchase price. Thus, the trial court’s finding that plaintiff was ready, willing and able to perform by reason of the purported commitment by Authorized Investors was entirely unsupported by legally admissible evidence.
 

 The trial court refused to admit defense testimony tending to impeach the hearsay testimony of plaintiff’s witness, Duncan. The defendants offered to prove that Robert Muller, Trustee of Authorized Investors Trust, had orally informed a defense witness that the purported letter of commitment from Authorized to plaintiff had never been issued, and that if issued, such commitment would only be to make a loan 18 months after the plaintiff had acquired title. The trial court rejected this proffered testimony on the ground that it was
 
 *538
 
 “hearsay.” Extrajudicial statements offered for impeachment are not hearsay since they are not offered for the truth of the matter asserted. (See generally Witkin, Cal. Evidence (2d ed. 1966) § 455.) Ordinarily, the witness to be impeached by his own inconsistent extrajudicial statement is one who has testified in court, but a hearsay declarant may also be impeached in the same manner, which simply means that where a witness in court testifies to admissible extrajudicial statements of a third party declarant, the prior or subsequent inconsistent statements of the declarant may be received when offered in evidence for purposes of impeachment.
 
 (People
 
 v.
 
 Collup,
 
 27 Cal.2d 829, 836 [167 P.2d 714];
 
 People
 
 v.
 
 Lawrence,
 
 21 Cal. 368, 371 - 372; Evid. Code, § 1202.) The purpose of allowing extrajudicial inconsistent statements is to be fair to the party against whom the hearsay was received inasmuch as he was denied the opportunity of cross-examination; thus, such party should at least be allowed to impeach the declarant by admitting the declarant’s own statements which are inconsistent with the declaration received in evidence.
 
 (People
 
 v.
 
 Lawrence, supra,
 
 21 Cal. 368, 371 - 372.) The foregoing rule applies where the hearsay testimony is properly admitted under some exception to the hearsay rule. Consequently, it appears that the trial court committed prejudicial error in receiving the inadmissible hearsay testimony of Duncan relating to the purported letter of commitment and then rejecting the admissible impeaching evidence. The impeaching evidence would have definitely tended to refute Duncan’s testimony to the effect that Authorized’s commitment of the loan funds would have placed the plaintiff in a position where it would have been financially able to purchase the property within the time specified in the contract.
 

 Furthermore, there was a complete lack of evidence tending to prove that Authorized had the financial ability to make the loan during the eseroAV period, even assuming that the evidence as to the letter of commitment had been properly received. As previously noted, where a purchaser is relying on a loan to pay the purchase price, it must appear that the third-party lender has the financial ability to negotiate the loan.
 
 (Pellaton
 
 v.
 
 Brunski, supra,
 
 69 Cal.App. 301, 304.) The testimony of the Oklahoma bank official called by the defense, Mr. Hughes, clearly indicated that during the months of OetoberNovember 1964 the bank account of Authorized Investors, Oklahoma City, never contained funds sufficient to make the
 
 *539
 
 loan to plaintiff. Supplemental^, there was proof that numerous checks drawn by Authorized were dishonored and returned for insufficient funds during this period, which checks totaled a sum in excess of $10,000. Eepresentatives of Authorized’s broker, Lincoln, testified that they were not aware that Authorized had ever, made a loan in excess of $100,000. Authorized was capitalized for only $10, had been in existence for only one year, and none of Duncan’s clients had ever received money from Authorized. Although such evidence does not constitute conclusive proof that Authorized was financially irresponsible, such proof was sufficient to shift the burden of proving Authorized’s financial ability to plaintiif. By reason thereof, the evidence was practically uneontradicted to the effect that Authorized did not have sufficient funds to make the loan. Where testimony is uncontradicted and unimpeached, it may not be arbitrarily disregarded, but should be regarded as proof of the fact testified to, especially where contrary evidence, if it existed, would be readily available but was not offered.
 
 (Joseph
 
 v.
 
 Drew,
 
 36 Cal.2d 575, 579 [225 P.2d 504].)
 

 The trial court’s finding that plaintiff had the financial ability to pay the purchase price was patently based on two premises: (1) Upon Duncan’s testimony as to the contents of the reputed letter of commitment from Authorized; and (2) upon the Ahmanson loan. No other evidence as to a source of funds was presented.
 

 Duncan’s description of the letter also reflects that the offer was for a future loan—a “take-out” commitment. Manifestly, such a letter does not constitute an offer to loan purchase money, but represents an offer for long-term financing. While Duncan indicated that the loan would have been available to the plaintiff 30 days after Weinberg’s acceptance of the letter of commitment, which simply means that the money would have been available on some date after November 15, 1964, the escrow closing date was November 6, 1964. Furthermore, the defendants' offer of impeaching testimony relating to extrajudicial statements made by Authorized Investors’ trustee, Muller, would have established that no funds were offered the plaintiff prior to the termination of the 18-month period. The prejudicial effect of refusing the offer of impeaching testimony is manifest inasmuch as in the event the funds were not available from Authorized to plaintiff for some 18 months after the purchase, plaintiff would not have had the financial ability to perform the contract of sale
 
 *540
 
 within the date contemplated for the closing of the escrow.
 

 Even under the rule that the evidence should be reviewed in the light most favorable to plaintiff, the plaintiff-buyer would not have received any money from Authorized until after November 15, 1964. Duncan testified: that he received the commitment letter on October 15, 1964; that plaintiff had 72 hours within which to accept the commitment; and that the loan would have been available to plaintiff approximately 30 days following plaintiff’s acceptance. In the absence of an express finding to the contrary, it therefore must be presumed that the trial court impliedly found that it was essential to the contract that the escrow be closed on or before November 6,1964.
 

 The testimony regarding the Ahmanson Bank loan commitment proves only that the plaintiff obtained a valid loan commitment immediately before trial, but did not establish the buyer’s financial ability at the time for performance. The testimony of Mr. Halseth concerning the Ahmanson Bank loan, to which objection was made, ought not to have been admitted. It is well-established that a litigant may ask an expert witness a question of a hypothetical nature. This question may be framed upon any theory which can be deduced from the evidence, and the questioner may assume any facts within the limits of the evidence and omit any facts not deemed material. (See
 
 Treadwell
 
 v.
 
 Nickel,
 
 194 Cal. 243, 267 [228 P. 25] ;
 
 Hutter
 
 v.
 
 Hommel,
 
 213 Cal. 677, 680 [3 P.2d 554] ; McCormick, Evidence (1954) § 14, p. 29; 2 Wigmore, Evidence (3d ed., 1940), § 672, p. 792.) However, it is improper to ask an expert witness a hypothetical question which assumes facts not in evidence or assumes inconsistent facts, that is, facts inconsistent with those in evidence.
 
 (Estate of Gould,
 
 188 Cal. 353, 356 [205 P. 457];
 
 People
 
 v.
 
 McCaughan,
 
 49 Cal.2d 409, 418 [317 P.2d 974]; 2 Wigmore, Evidence, § 682, p. 805.) Halseth’s testimony was based upon an assumption of facts which were not in evidence. Halseth stated that the Ahmanson Bank would have made a purchase money loan on the property if request for such had been made by Louis Weinberg, the Seigels, and A. J. Weiss. He did not testify that he would have made such a loan to Louis Weinberg individually, or to the Am-Cal Investment Co. In fact, Halseth positively stated that he did not know whether or not the bank would have advanced the money to Weinberg or Am-Cal without the Seigels and Weiss being parties to the transaction. Neither the Seigels nor Weiss
 
 *541
 
 had any interest in the escrow agreement at the time it was due to close. Thus, Halseth’s testimony that his bank would have been willing to advance the purchase money in October or November 1964 assumes a fact inconsistent with the facts in evidence, i.e., that the Seigels and Weiss had an interest in the escrow in November 1964. Therefore, its admission was clearly erroneous.
 

 The plaintiff urges that a buyer seeking specific performance of a land sales contract need prove ability to perform only at the time of trial, and that such proof may be introduced in the form of a hypothetical loan which could have been secured by the buyer following the seller’s wrongful repudiation. The plaintiff urges that evidence of a hypothetical loan is sufficient to support a finding that the buyer at all times after the repudiation was financially able to perform and eliminates the necessity of proving any actual loan or loan commitment during the time provided in the escrow agreement. The cases cited by the plaintiff,
 
 Beverage
 
 v.
 
 Canton Placer Min. Co., supra,
 
 43 Cal.2d 769;
 
 Dotson
 
 v.
 
 International Alliance etc. Employes, supra,
 
 34 Cal.2d 362;
 
 Buckmaster
 
 v.
 
 Bertram, supra,
 
 186 Cal. 673;
 
 Upton
 
 v.
 
 Gould,
 
 64 Cal.App.2d 814 [149 P.2d 731], for the proposition that a buyer in a specific performance action need prove ability to perform only
 
 at the time of trial
 
 do not stand for, or support, such a rule, and are, therefore, inapplicable. Numerous foreign authorities have been cited in support of the purported rule
 
 (Spuches
 
 v.
 
 Royal View, Inc.
 
 23 Misc.2d 878 [202 N.Y.S.2d 51], mod. 13 App.Div.2d 523 [212 N.Y.S.2d 394, rev. on other grounds 13 App.Div.2d 815 [216 N.Y.S.2d 468];
 
 Burford
 
 v.
 
 Pounders,
 
 145 Tex. 460 [199 S.W.2d 141];
 
 Detwiler
 
 v.
 
 Capone,
 
 357 Pa. 495 [55 A.2d 380] ;
 
 Moehling
 
 v.
 
 Pierce,
 
 3 Ill.2d 418 [121 N.E.2d 735]), but are inapplicable inasmuch as the buyers in the cited cases all had the financial ability to perform the sales contract within the time provided by the contract for performance, or involved other issues such as tender.
 

 An essential basis for the equitable remedy in spe- . cific performance must be a showing by the plaintiff of performance, or tender of performance, or ability and willingness to perform; where the complaint does not allege ability to perform when performance is due, nor tender of the balance of the purchase price
 
 within the time required Toy the contract,
 
 specific performance will be denied, notwithstanding the
 
 *542
 
 seller’s default in failing to convey.
 
 (Cockrill
 
 v.
 
 Boas, supra,
 
 233 Cal. 490, 492.) The buyer’s financial ability may be proved by showing the purchaser had liquid assets, property which could be sold and the proceeds used as collateral for a loan, or an actual loan commitment, providing such resources are sufficient to close the deal.
 
 (Merzoian,
 
 v.
 
 Kludjian, supra,
 
 183 Cal. 422, 430;
 
 Globerman
 
 v.
 
 Lederer,
 
 281 App.Div. 39 [117 N.Y.S.2d 549, 551-552].) The plaintiff herein, and its president Weinberg, had neither corporate nor individual assets sufficient to consummate the escrow on or before November 6, 1964. Similarly, there was a complete lack of proof that plaintiff had an actual loan commitment from a financially responsible lending institution or or before November 6,1964.
 

 It is readily apparent that the admission of the improper evidence was prejudicial. Before Duncan’s testimony was introduced, the trial court granted a judgment for defendants pursuant to the provisions of section 631.8 of the Code of Civil Procedure on the sole ground that plaintiff had failed to prove it was ready and able to perform within the time provided in the agreement. Thereafter, when the plaintiff’s motion to reopen was granted and Duncan’s testimony was received, the trial court vacated the judgment for defendants and entered judgment for the plaintiff. While the court thereafter gave the defendants an opportunity to reopen for rebuttal, the court improperly excluded important rebuttal testimony and finally relied on Duncan’s testimony as sufficient in itself to support the judgment for the plaintiff. In the event the trial court relied on the Ahmanson loan to sustain its finding that the plaintiff was able to perform the contract, such evidence did not lend any support to the trial court’s action inasmuch as the ability to perform must be displayed during the existence of the contract and not merely at the time of trial.
 

 Upon the retrial of this action, in the event the trial court should ultimately determine that plaintiff is not entitled to an equitable decree of specific performance, it should nevertheless consider the propriety of awarding plaintiff any damages sustained by reason of the defendants’ anticipatory breach of the agreement to sell, including, but not necessarily limited to, restitution of its $15,000 deposit.
 

 The judgment is reversed.
 

 McCabe, P. J., and Tamura, J., concurred.