Filed 8/1/16  Grow Land and Water v. McCarthy Family Farms CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| GROW LAND AND WATER, LLC et al., Plaintiffs and Appellants, v. MCCARTHY FAMILY FARMS, INC. et al., Defendants and Appellants. | F069959 (Super. Ct. No. 09C0378) OPINION |

-ooOoo-

APPEAL from a judgment of the Superior Court of Kings County.  Thomas DeSantos, Judge.

Reed Smith, Raymond A. Cardozo, Paul D. Fogel, Brian A. Sutherland; McCormick, Barstow, Sheppard, Wayte & Carruth, Marshall C. Whitney, Todd W. Baxter, Laura A. Wolfe, Scott M. Reddie; Griswold, LaSalle, Cobb, Dowd & Gin and Jim D. Lee for Defendants and Appellants.

Baker, Keener & Nahra, Phillip Alden Baker; Georgeson and Belardinelli, C. Russell Georgeson, Richard A. Belardinelli; Greines, Martin, Stein & Richland, Robin Meadow, Cynthia E. Tobisman and Gary J. Wax for Plaintiffs and Appellants.

-ooOoo-

Defendants and appellants, McCarthy Family Farms, Inc. (McCarthy), Sandridge Partners (Sandridge), and John Vidovich, challenge the judgment entered after a jury found them liable for breach of, and intentional interference with, two option contracts. The jury awarded plaintiffs and appellants, Kings County Ventures, LLC (KCV) and Grow Land and Water, LLC (Grow), $73.4 million in compensatory damages plus punitive damages. McCarthy, Sandridge and Vidovich contend that neither the liability findings nor the damages awarded are supported by substantial evidence. KCV and Grow challenge the trial court's order reducing the punitive damages award.

Contrary to appellants' position, the liability findings are supported by the record. However, the damages are not.

At issue are option contracts for the sale of real property. One element of the damages for breach of and interference with these contracts is the difference between the option price and the fair market value of the property at the time of the breach. Proof of the value of real property may only be shown through the opinions of a qualified expert or the owner of the property in question. KCV and Grow did not present competent opinion testimony and therefore did not meet their burden of proof. Accordingly, while the liability findings will be affirmed, the compensatory and punitive damages awards will be reversed and the matter remanded for further proceedings.

## BACKGROUND

In 2006, William Quay Hays started planning a new community to be built along Interstate 5 in Kings County near the Kern County line. His goal was to create a technologically-advanced, sustainable, and environmentally-responsible city of 150,000 residents named Quay Valley. To succeed, Hays needed land with a reliable water source and access to Interstate 5.

Hays learned that a developer, Jerry Lowrie, held an option to purchase 1,400 acres along Interstate 5 on which Lowrie planned to build a NASCAR speedway. McCarthy had an option to purchase this property, which was part of a 5,100-acre parcel

2.

known as Morris Ranch. The agreement between McCarthy and Lowrie gave Lowrie an option to purchase the property after McCarthy acquired the property pursuant to its own option.

Since Hays needed land near Interstate 5 and Lowrie needed money to make his next option payment, they struck a deal to integrate the NASCAR track project into Quay Valley. Hays took over Lowrie's company and changed its name to KCV.

In 2006, KCV and McCarthy entered into an option agreement for the entire 5,100 acres of Morris Ranch. When McCarthy bought the Morris Ranch directly from its owner at the option price of $1,200 per acre, KCV agreed to buy it from McCarthy for $8,500 per acre.

McCarthy also owned property adjacent to Morris Ranch known as Liberty Ranch. Two parcels comprised Liberty Ranch, 4,447 acres referred to as Liberty 1 Ranch, and 17,807 acres referred to as Liberty 2 Ranch.

In June 2007, KCV acquired an option to purchase Liberty 1 Ranch from McCarthy for approximately $24 million. The purchase was to include 4,447 acres of land and the right to 5,280 acre-feet of water from the Angiola Water District. The agreement valued the land at $1,100 per acre and the water at $4,285 per acre-foot.

Liberty 2 Ranch had significant surface and ground water rights from the Angiola Water District with an annual supply of approximately 19,945 acre-feet of water. Water attorney Michael Nordstrom, hired by KCV at McCarthy's suggestion, recommended that Hays purchase Liberty 2 Ranch to satisfy Quay Valley's water needs.

Thereafter, Hays acquired an option to purchase Liberty 2 Ranch from McCarthy for approximately $27 million. The price was calculated at $1,500 per acre for 17,866 acres and included an Angiola Water District allocation equal to 1.3 acre-feet of water per acre of land. The agreement stated that the sale could not close until KCV closed on the Liberty 1 Ranch sale. Hays conveyed the Liberty 2 Ranch option to his solely owned

3.

company, Liberty Land and Water Company, LLC (Liberty Land and Water), which was later renamed Grow.

KCV spent approximately $7.8 million on planning for Quay Valley. These expenses included multiple studies, the preparation of a specific development plan and an environmental impact report, and negotiations with home developers and with Kings County. By March 2009, KCV had completed a significant portion of the planning requirements. However, due to the economic downturn, KCV suspended the planning process.

In mid-2008, KCV's financial condition was "very difficult." Accordingly, KCV wanted to postpone its purchase of Morris Ranch. To enable KCV to negotiate directly with the Morris Ranch owner, McCarthy assigned its Morris Ranch option to KCV. In exchange, KCV agreed to make payments to McCarthy totaling $30 million upon the happening of certain events pertaining to Quay Valley and KCV's purchase of Morris Ranch. This "performance agreement" also eliminated the need for KCV to purchase Morris Ranch before exercising the Liberty 1 Ranch option.

The Liberty 2 Ranch option expired in February 2008. McCarthy offered Hays a revised option to purchase Liberty 2 Ranch. On March 2, 2009, Hays, on behalf of Liberty Land and Water, executed both the revised option and an assignment of that option to KCV. KCV then made the option payment. The revised option agreement also provided that, upon close of escrow, the parties would execute a three-year lease that would give McCarthy the right to farm Liberty 2 Ranch and use its water.

Sandridge, a family farming operation, is run by Vidovich. There are three additional Sandridge partners who are not actively involved in the business, Kathryn Tomaino, Michael Vidovich and Larry Ritchie. Sandridge's property is adjacent to Liberty Ranch.

Vidovich was interested in Liberty Ranch and had tried to buy it multiple times. However, the parties could not agree on a price.

4.

In November 2008, Vidovich agreed to buy a minimum of 8,000 acre-feet and up to 12,000 acre-feet of Liberty Ranch's water for the 2009 growing season at $255 per acre-foot.  McCarthy and Vidovich decided to keep the terms of this transaction quiet.  Accordingly, KCV and Hays were unaware of this water sale.  To move the water to his property, Vidovich built a four-mile long pipeline at a cost of over $3 million.

Shortly after KCV made the option payment on Liberty Ranch in early March 2009, Nordstrom sent an email to Hays warning him that a number of issues had arisen with respect to the Liberty Ranch water that were "not good."  Nordstrom explained that dairies and crop shifts had caused a significant overdraft in the area and there was both a regulatory and climatic drought.  Nordstrom advised Hays that, given the current state of water and the politics of urban versus agriculture water use, Hays really needed to look for another source of water.  Hays questioned Nordstrom's position noting that it was contrary to the historical reliability of Angiola Water and the water assessments that had recently been completed.

On March 21, 2009, Sandridge agreed to buy Liberty Ranch from McCarthy for $41 million subject to the options held by KCV and Grow.  Sandridge agreed to pay $36 million in cash, with a $5 million carryback.

At about this time, the KCV board of directors was losing confidence in Hays as KCV's manager.  Part of this loss in confidence was caused by Nordstrom notifying KCV chairman Vincent Barabba and director Kathleen Kramer that the Liberty Ranch water was not secure.  However, other factors related to Hays's interactions with the board also played a part.  In late March 2009, KCV's members voted to replace Hays as KCV's manager and appointed Kramer to take Hays's place.

As KCV's manager, Kramer sought to change KCV's strategy and scale back its business plan.  KCV held a board meeting in April 2009 to discuss such modifications.  Nordstrom attended this meeting to advise KCV.  At that time, Nordstrom informed KCV that he was also doing work for Sandridge and McCarthy and that Sandridge and

5.

McCarthy had entered into a purchase agreement for Liberty Ranch. However, Nordstrom did not disclose to KCV that he would receive a large commission if McCarthy sold Liberty Ranch to Sandridge.

KCV also started discussing a potential land and water deal with Sandridge as recommended and negotiated by Nordstrom. On July 12, 2009, KCV and Sandridge signed a letter agreement. KCV agreed to not exercise its Liberty Ranch options in exchange for options on up to 3,800 acres of other property owned by Sandridge and the right to purchase up to 10,000 acre-feet of State Water Project water. The agreement stated that final option contracts were to be prepared by KCV's attorneys and that "[p]rior to KCV terminating its agreement with McCarthy, Sandridge shall provide KCV a [preliminary title report]." However, the final option contracts were never prepared and Sandridge did not provide KCV with a preliminary title report.

In August 2009, Grow offered to buy KCV's assets for $10 million. Effective August 31, Kramer stepped down as KCV's manager. Thereafter, Art Torres became KCV's manager and KCV accepted Grow's offer.

On September 1, 2009, KCV exercised its option to purchase Liberty 1 Ranch. The closing date was set for November 30 and KCV was required to deposit the purchase money into escrow by November 27. However, this date could be pushed to December 30 under the option contract.

In September 2009, Michael Bedner, the co-founder, CEO and chairman of Hirsch-Bedner, joined Hays's team and invested $350,000 in Grow. Hirsch-Bedner is the leading hospitality design firm in the world and handles high-end hotel projects globally.

In November 2009, Sandridge and McCarthy amended their March 21, 2009 purchase agreement for Liberty Ranch. As amended, the agreement provided that Sandridge would pay McCarthy $26.5 million of the $41 million purchase price immediately and pay the remainder when McCarthy provided suitable insurable title.

6.

Sandridge also represented that it had an agreement from KCV terminating KCV's option rights and agreed to indemnify McCarthy against legal action by Hays or his affiliates.

Sandridge wired the money to McCarthy and McCarthy conveyed Liberty Ranch to Sandridge, outside of escrow and without title insurance, by deed dated November 20, 2009. This deed was recorded on November 23.

When KCV learned of the sale to Sandridge, it sent a letter to McCarthy giving notice of the breach of the option agreements. KCV demanded that McCarthy "arrange for reconveyance of the property back to you and reconfirm your willingness and ability to close." Thereafter, KCV stopped seeking financing for Liberty 1 Ranch.

On December 11, 2009, KCV and Grow filed a complaint against McCarthy, Sandridge, Vidovich, Nordstrom, and the three other individual Sandridge partners. KCV alleged that McCarthy breached the Liberty 1 Ranch option contract and that Sandridge, Vidovich and Nordstrom intentionally interfered with that contract. Grow alleged that McCarthy breached the Liberty 2 Ranch option contract and that Sandridge, Vidovich and Nordstrom intentionally interfered with that contract. KCV and Grow demanded specific performance of the Liberty option contracts or, alternatively, damages. KCV and Grow also sought punitive damages on their tort claims.

McCarthy and Sandridge cross-complained against KCV and Grow seeking declaratory relief and damages related to the alleged breach of the July 12, 2009 agreement between KCV and Sandridge.

Nordstrom settled and was dismissed.

On its own motion, the trial court requested briefing from the parties regarding the order in which the equitable and legal issues should be tried. The court then ruled that the specific performance claims would be tried first through a court trial. In response, KCV and Grow voluntarily dismissed their specific performance causes of action.

The bifurcated case proceeded to a jury trial. The jury found in favor of KCV and Grow on all liability issues. The jury concluded that McCarthy breached both the

7.

Liberty 1 Ranch option contract with KCV and the Liberty 2 Ranch option contract with Grow. The jury found Vidovich and Sandridge liable for intentional interference with the option contracts and that their conduct was oppressive, fraudulent or malicious.

The jury then awarded KCV and Grow $73.4 million in compensatory damages and $55 million in punitive damages against the Sandridge defendants. Following posttrial motions, the trial court conditionally remitted the punitive damages to $2 million against Sandridge and $1 million against Vidovich. The court granted a judgment notwithstanding the verdict in favor of Kathryn Tomaino, Michael Vidovich and Larry Ritchie on the award of punitive damages against them.

## DISCUSSION

### 1. *KCV was not bound by the July 12, 2009 letter agreement.*

As noted above, KCV and Sandridge executed a letter agreement on July 12, 2009. KCV agreed it would not exercise its option to acquire the Liberty Ranch in exchange for options to purchase up to 3,800 acres of replacement land and up to 10,000 acre-feet of water owned by Sandridge. However, the particular parcels of land to be optioned and the option prices were not specified. Land was to be purchased in approximately 640-acre sections, unless otherwise agreed to by Sandridge, and prices were listed based on what crops were growing. For example, bare land was to be priced at $1,500 per acre, land with almonds was to be priced at $16,000 per acre, land with table grapes was to be priced at $24,000 per acre, and so on. Vidovich did not know "exactly what the 3800 [acres] encompassed."

The July 12, 2009 letter agreement further provided that KCV's promise to not exercise the Liberty Ranch option was contingent on Sandridge executing the final option agreements that were to be prepared by KCV's attorney. Additionally, the letter agreement states: "Prior to KCV terminating its agreement with McCarthy, Sandridge shall provide KCV a [preliminary title report], showing all matters of record and all items which would be shown as exceptions on a policy of title insurance .… Subject to review

of the title reports, KCV shall take the land 'AS IS.' " However, the final option contracts were never drafted and Sandridge did not provide KCV with a preliminary title report.

The jury found that KCV did not give up its rights under the Liberty 1 Ranch option agreement by signing the July 12, 2009 letter agreement. In ruling on Sandridge's posttrial motions, the trial court found that sufficient evidence was introduced to support the jury's finding. The court concluded the letter agreement contemplated further agreement and contracts. The court further found that the sale details were incomplete and that Sandridge never established it had clear title to the property, a condition precedent to KCV's release of the Liberty Ranch options.

Sandridge contends the trial court erred as a matter of law in ruling posttrial that "KCV did not give up its right to purchase Liberty 1 due to the July 12, 2009, Sandridge/KCV agreement." Sandridge argues the parties objectively manifested their mutual consent to be bound by the agreement; the agreement was not merely an agreement to agree; the contract terms were sufficiently certain; and Sandridge's failure to provide a preliminary title report was excused by KCV's repudiation of the agreement.

Contrary to Sandridge's position, the trial court correctly concluded that a preliminary title report and proof of Sandridge's clear title was a condition precedent to KCV's performance and therefore the letter agreement was unenforceable. Further, KCV's exercise of the Liberty Ranch option did not excuse Sandridge's failure to provide the preliminary title report.

Parties to a contract may expressly agree that a right or duty is conditional upon the occurrence or nonoccurrence of an act or event. (*Platt Pacific, Inc. v. Andelson* (1993) 6 Cal.4th 307, 313.) The existence of such a condition precedent generally depends upon the intent of the parties as determined from the words they have used in the contract. (*Realmuto v. Gagnard* (2003) 110 Cal.App.4th 193, 199.)

9.

While provisions of a contract will not be construed as conditions precedent in the absence of language plainly requiring that construction (*Rubin v. Fuchs* (1969) 1 Cal.3d 50, 53), such language is present here. The letter agreement unambiguously states that KCV would not terminate its option agreement with McCarthy before it received a preliminary title report from Sandridge "showing all matters of record and all items which would be shown as exceptions on a policy of title insurance." Thus, KCV's duty to terminate its agreement with McCarthy did not arise because it did not receive a preliminary title report on the 3,800 acres of proposed replacement land.

Further, the record demonstrates that KCV considered the preliminary title report to be a critical element of the deal. Before KCV could commit to giving up Liberty Ranch, it needed to know what it was getting as substitute land. Kramer testified that receiving a copy of the preliminary title report was important because KCV needed to understand what it was actually agreeing to purchase. According to Kramer, due diligence required that she "see what other exceptions, easements, mineral rights" and "other things were associated with the land," as well as whether the land fell within the Williamson Act. Moreover, after signing the letter agreement, Kramer reminded Vidovich that a preliminary title report " 'was a condition' " to KCV's giving up its option agreement with McCarthy.

Sandridge additionally asserts that when KCV exercised the Liberty Ranch option on September 1, 2009, it repudiated the letter agreement and thereby excused Sandridge from providing the preliminary title report.

A contract repudiation may be either express or implied. (*Taylor v. Johnston* (1975) 15 Cal.3d 130, 137.) "An express repudiation is a clear, positive, unequivocal refusal to perform [citations]; an implied repudiation results from conduct where the promisor puts it out of his power to perform so as to make substantial performance of his promise impossible [citations]." (*Ibid.*)

10.

Here, KCV did not expressly repudiate the letter agreement. Thus, any repudiation would need to be implied from KCV's conduct. However, exercising the option did not cause KCV to be unable to perform. KCV still had the power to step aside and let Sandridge close on Liberty 1 Ranch. Moreover, Sandridge was in default because it failed to provide a preliminary title report.

In light of this conclusion, the trial court properly dismissed Sandridge's cross-complaint against KCV and Grow for breach of, and interference with, the July 12, 2009 letter agreement.

**2.      *Whether Grow assigned the Liberty 2 Ranch option to KCV is irrelevant.***

At trial, Sandridge and Vidovich (collectively Sandridge) argued that if Grow effectively assigned the Liberty 2 Ranch option to KCV, it lacked standing to assert claims relating to that option. Grow and KCV took the position that the assignment question was irrelevant because it was an issue between Grow and KCV and their interests were aligned.

Over Grow and KCV's objection, the special verdict asked the jury whether Grow had assigned the Liberty 2 Ranch option to KCV. The jury answered "No."

Sandridge asserts the evidence establishes as a matter of law that KCV accepted the assignment from Grow and therefore Grow did not have standing to prosecute the Liberty 2 Ranch claims. In other words, the Liberty 2 Ranch claims were not pursued by the real party in interest. Accordingly, Sandridge argues, it is entitled to judgment on those claims.

The purpose of requiring a cause of action to be prosecuted by the real party in interest is to protect the defendant " 'against whom a judgment may be obtained, from further harassment or vexation at the hands of other claimants to the same demand.' " (*Anheuser-Busch, Inc. v. Starley* (1946) 28 Cal.2d 347, 351-352.) However, when a judgment for or against the nominal plaintiff would protect the defendant from any action upon the same demand by another, and when as against the nominal plaintiff, the

11.

defendant may assert all defenses and counterclaims that would be available were the claim prosecuted by the real owner, such concern is not present. (*Philbrook v. Superior Court* (1896) 111 Cal. 31, 34-35.)

Here, Grow and KCV were coplaintiffs. Thus, both Grow and KCV would be collaterally estopped from bringing a future action on the Liberty 2 Ranch option against Sandridge. Accordingly, even if KCV is the real party in interest, its status is not a ground for reversal. Sandridge "is fully protected from future action, and the purpose of any objection to the suit upon that ground has been served." (*Greco v. Oregon Mut. Fire Ins. Co.* (1961) 191 Cal.App.2d 674, 687.)

### 3. *The jury's finding that KCV and Grow had the ability to fund the purchase of Liberty Ranch is supported by substantial evidence.*

To recover damages for breach of their option contracts, KCV and Grow were required to prove that they would have had the ability to perform under the contracts if McCarthy had not breached. (*Ersa Grae Corp. v. Fluor Corp.* (1991) 1 Cal.App.4th 613, 625-626.) Whether a buyer is ready, willing and able to perform is a question of fact. (*Henry v. Sharma* (1984) 154 Cal.App.3d 665, 672 (*Henry*).) Accordingly, the first two questions on the special verdict form asked: "Did KCV[/Grow] have the ability to fund, or access to the funds, for the purchase of Liberty Ranch I[/II] on time if McCarthy had given KCV[/Grow] the opportunity to do so, rather than selling Liberty Ranch I[/II] to Sandridge?" To both questions, the jury answered "Yes."

Sandridge argues the jury's findings are not supported by substantial evidence. Hence, we review the whole record in a light most favorable to the judgment, resolving all evidentiary conflicts and drawing all reasonable inferences in favor of the jury's decision. We must accept any reasonable interpretation of the evidence that supports the jury's decision. Nevertheless, we may not defer to that decision entirely. Substantial evidence is not synonymous with *any* evidence. To be considered "substantial," the

12.

evidence must be reasonable in nature, credible, and of solid value. (*McRae v. Department of Corrections & Rehabilitation* (2006) 142 Cal.App.4th 377, 389.)

The proof required to show a buyer is ready, willing and able to perform depends on all of the surrounding circumstances. (*Henry, supra,* 154 Cal.App.3d 665, 672.) For example, "financial ability may be proved by showing the purchaser had liquid assets, property which could be sold and the proceeds used as collateral for a loan, or an actual loan commitment, providing such resources are sufficient to close the deal." (*Am-Cal Investment Co. v. Sharlyn Estates, Inc.* (1967) 255 Cal.App.2d 526, 546.)

In the loan context, the buyer need only command resources upon which it could obtain the requisite credit. (*Henry, supra,* 154 Cal.App.3d at p. 672.) The buyer is not required to have a legally enforceable loan contract. (*WYDA Associates v. Merner* (1996) 42 Cal.App.4th 1702, 1716.)

As noted above, the closing date for Liberty 1 Ranch was set for November 30, 2009, and the purchase money had to be deposited into escrow by November 27. The amount needed to close on Liberty 1 Ranch was approximately $23.6 million, the approximately $23.9 million purchase price minus approximately $300,000 in option payments received by McCarthy. However, this closing date could be pushed to December 30 in the event of a default.

Sandridge asserts that Grow would have had to deposit $28.4 million in escrow to close Liberty 1 Ranch because Grow was obligated to pay KCV $5 million under its agreement to purchase KCV's assets. However, KCV and Grow's only contractual obligation to McCarthy was to purchase Liberty 1 Ranch for $23.6 million. Thus, only $23.6 million was required in escrow to close on Liberty 1 Ranch.

In the months leading up to November 2009, KCV and Grow had been exploring various options for obtaining long-term financing for both Liberty 1 Ranch and Liberty 2 Ranch. KCV and Grow had been in discussions with nearby farmers, Paramount Farms and Woolf Farms, who had expressed interest in leasing Liberty Ranch's water.

13.

Financier, Byron Georgiou, was also interested in the project. Georgiou said he was "serious in terms of pursuing the potential of either being an equity member or a lender as related to this transaction" and "was intending to pursue it further." Additionally, Hays was in discussions with MSD Capital, Michael Dell's investment entity, to borrow up to $40 million to finance the Liberty Ranch acquisition. However, as of November 24, 2009, the day KCV and Grow learned of the transfer of Liberty Ranch to Sandridge, KCV and Grow did not have either a signed agreement for the sale or lease of water or a written loan commitment.

Nevertheless, Michael Bedner, a Grow equity partner, testified that he was willing and able to provide the money required to close on the Liberty 1 Ranch as a short-term "bridge loan." Bedner stated that in 2009 he had a net worth of between $60 million and $65 million with at least $7 million in easily accessible cash.

Bedner is the co-founder, CEO and chairman of Hirsch-Bedner, the world's largest hotel design company. Bedner has a 39.7 percent voting interest in Hirsch-Bedner and is the majority shareholder. In 2009, Hirsch-Bedner had over $28 million in cash and cash equivalents and over $14 million in receivables.

Bedner testified that, to finance the bridge loan, he intended to put in $5 million of his own money and ask Hirsch-Bedner for between $20 million and $22 million. At that time, Bedner controlled the Hirsch-Bedner finances and had influence over the board. Bedner stated unequivocally that he intended to fund the deal if Hays did not line up long-term financing before the closing date and that he was "ready and willing to do that transaction."

In denying Sandridge's motion for judgment notwithstanding the verdict on the causation issue, the trial court found "that evidence was presented that Bedner had the ability and the willingness to obtain funds for the purchase of Liberty 1." The court noted that the purchase of Liberty 2 Ranch was not required to be finalized until March

14.

2011, if the option payments were made, and that the purchase of the Morris Ranch was no longer a condition precedent to the Liberty Ranch purchase.

Sandridge argues Bedner's testimony did not constitute substantial evidence that KCV and Grow would have been able to obtain the necessary funding to close on Liberty 1 Ranch. Sandridge notes that Bedner would have needed director and shareholder approval before Hirsch-Bedner could make such a loan and that, as of November 24, 2009, Bedner had not approached the other directors or shareholders. Thus, Sandridge asserts, Bedner's testimony expresses no more than a belief that he could have secured the third party loan and, under California case authority, such "belief" testimony is not substantial evidence. (*Merzoian v. Kludjian* (1920) 183 Cal. 422, 428 (*Merzoian*); *Mattingly v. Pennie* (1895) 105 Cal. 514, 522 (*Mattingly*).)

In *Mattingly,* the only evidence of the buyer's ability to perform was his own testimony that he expected to obtain the necessary funds from a "syndicate." (*Mattingly, supra,* 105 Cal. at p. 522.) Similarly, in *Merzoian,* the buyer's testimony was uncertain regarding what money he had and, in any event, it was insufficient to make the purchase. The only other evidence of ability to perform was the buyer's testimony that third parties had made unenforceable oral promises to lend the buyer additional money. (*Merzoian, supra,* 183 Cal. at p. 428.) Under these circumstances, the courts in *Mattingly* and *Merzoian* held that the evidence was insufficient to demonstrate the buyer was ready, willing and able to purchase the property. "That testimony amounted to nothing more than a statement of his belief that persons not bound by contract to do so would have advanced the money; and it is clearly not such evidence as … would justify the jury in finding that he had the ability to pay." (*Mattingly, supra,* 105 Cal. at p. 522.)

Here, however, considering all the surrounding circumstances, there was sufficient evidence to support finding that Bedner was ready, able, and willing to make the bridge loan. In addition to having a net worth of around $60 million, Bedner was the major shareholder in a company with a substantial net worth including $28 million in cash and

15.

cash equivalents. Thus, Bedner "commanded resources upon which he could obtain the requisite credit." (*Merzoian, supra,* 183 Cal. at p. 430.)

Sandridge further points out that Bedner admitted that the major shareholders would have needed to conduct "their own independent due diligence" before making the loan. According to Sandridge, there was no evidence that this due diligence could have been completed before December 30, 2009.

However, when Sandridge purchased the Liberty Ranch before the end of the option period, KCV, Grow, and Bedner ceased their efforts to obtain financing. There was no longer any property to purchase. KCV and Grow lost the opportunity to close when McCarthy breached the option contract by selling the Liberty Ranch to Sandridge. (Cf. *02 Development, LLC v. 607 South Park, LLC* (2008) 159 Cal.App.4th 609, 613.) Under these circumstances, the jury could reasonably have concluded that Bedner would have arranged the bridge loan by December 30, 2009 if Sandridge's purchase had not deprived KCV and Grow of the opportunity to close on the Liberty 1 Ranch.

Moreover, the jury could reasonably have found that, with a bridge loan in hand, KCV and Grow would have been able to arrange long-term financing. As noted above, both Byron Georgiou and MSD Capital expressed considerable interest in financing Liberty Ranch. The jury also heard testimony that, at the time of trial, Paramount Farms had been purchasing water from Sandridge for several years. Thus, there was evidence that financing based on Liberty Ranch water sales and water leases was feasible.

Accordingly, resolving all evidentiary conflicts and drawing all reasonable inferences in favor of the jury's decision, substantial evidence supports the jury's finding that KCV and Grow would have been able to fund the purchase of Liberty Ranch on time if McCarthy had given them the opportunity to do so. Because we are upholding the jury's finding that McCarthy and Sandridge are liable for breach of the option contracts, KCV and Grow remain the prevailing parties. Therefore, McCarthy and Sandridge's

16.

appeal of the trial court's order awarding fees to KCV and Grow and denying in part McCarthy and Sandridge's motion to tax costs has no merit.

**4.      *The compensatory damages award is not supported by the record.***

The measure of damages for a seller's breach of an agreement to convey real property is the difference between the purchase price and the fair market value of the property on the date of the breach, plus consequential damages.  (Civ. Code, § 3306; *Horning v. Shilberg* (2005) 130 Cal.App.4th 197, 206.)  Accordingly, the trial court instructed the jury that, to recover damages, KCV and Grow had to prove:  (1) The difference between the fair market value of the property on the date of the breach and the contract price; (2) the amount of any payments made toward the purchase; (3) the amount of any reasonable expenses for examining title and preparing documents for the sale; and (4) the amount of any reasonable expenses in preparing to occupy the property.  Although proof of the precise amount of damages is not required, some reasonable basis of computation must be used.  (*Scheenstra v. California Dairies, Inc.* (2013) 213 Cal.App.4th 370, 402.)

However, special rules of evidence apply in any action in which the market value of real property must be ascertained.  (Evid. Code, § 810, subd. (a).)  One such rule is that proof of the value of property may only be shown through the opinions of a qualified expert or the owner of the property in question.  (Evid. Code, § 813, subd. (a).)  These limitations are to prevent evidence, otherwise admissible, from being used to support a verdict outside the range of opinion testimony.  (*State of California ex rel. State Public Works Board v. Wherity* (1969) 275 Cal.App.2d 241, 249 (*Wherity*).)

### *i.  No expert witness testimony supports the damages award.*

Here, only one expert witness testified as to the November 2009 market value of Liberty Ranch.  The expert hired by Sandridge, Michael Ming, an agricultural real estate appraiser, valued the Liberty Ranch at $36.5 million.  Although Ming is not a water expert, he included the water associated with Liberty Ranch in his valuation.

KCV and Grow did not present any expert opinion on Liberty Ranch's value in 2009. They proffered testimony from Eric Robbins, a water consultant, who valued the water and predicted what profits could be earned if the water were sold. Robbins admitted he was not qualified to value the land. Using this method, Robbins valued Liberty 1 Ranch at $255.7 million and Liberty 2 Ranch at $203.8 million. However, following a hearing outside the presence of the jury, the trial court excluded his testimony as "too speculative." KCV and Grow did not appeal this ruling.

### ii. *Owner testimony does not support the damages award.*

Sandridge moved for judgment notwithstanding the verdict or, alternatively, a new trial, on the ground that the $73.4 million damage award was excessive and not supported by substantial evidence. Taking into consideration the approximately $7 million in option payments and expenses that KCV and Grow are entitled to, the jury necessarily determined that Liberty Ranch's fair market value exceeded the approximately $50.6 million contract price by approximately $66.4 million for a total fair market value of around $117 million.

The trial court, noting that the value of real property may be based on the opinion of the owner, denied the motion finding that the evidence of what Sandridge paid McCarthy for Liberty Ranch reflected the owner's opinion of the value. However, the trial court's calculation included elements that are not supported by the record.

In March 2009, Sandridge agreed to pay $41 million for Liberty Ranch subject to the KCV and Grow options and lease part of the property back to McCarthy for 50 years for $1 per year. The lease was for the "shop property," which consisted of shop buildings, an office, truck scales and an abandoned airstrip.

Sandridge and McCarthy amended the agreement in November 2009. Sandridge agreed to pay $26.5 million immediately and the balance when it obtained insurable title to the property. Sandridge also agreed to indemnify McCarthy against any action brought by KCV and Grow.

However, Sandridge was unable to get a loan to finance the purchase. In response, Sandridge and McCarthy again modified their agreement. Vidovich testified that Sandridge paid $26 to $28 million in cash, with McCarthy carrying back $10 million, and provided opportunities for McCarthy to invest in Sandridge. These investment opportunities consisted of Sandridge (1) agreeing to sell some of its property to McCarthy to facilitate a tax-deferred exchange under 26 U.S.C. section 1031 (section 1031); and (2) giving McCarthy the option to contribute additional property to Sandridge in exchange for an ownership interest.

When McCarthy sold Liberty Ranch to Sandridge in 2009, Sandridge in turn sold some of its property to McCarthy to enable McCarthy to defer the taxes on the gain McCarthy realized on the Liberty Ranch sale under section 1031. Approximately three years later, McCarthy contributed the property it had purchased from Sandridge back to Sandridge in exchange for a nine percent interest in the partnership. In 2012, the equity value of Sandridge was approximately $316.7 million. Once McCarthy became a partner in Sandridge, it began receiving distributions of $150,000 per quarter.

In analyzing the evidence relating to the Liberty Ranch sale price as evidence of its value in 2009, the trial court recited that McCarthy received $41 million in cash plus a nine percent interest in Sandridge. However, McCarthy did not receive the entire $41 million in cash. More importantly the nine percent interest in Sandridge was not part of the sale proceeds. Rather, Sandridge gave McCarthy an option to buy into Sandridge in the future. Three years later, McCarthy contributed the property it had purchased from Sandridge back to Sandridge in exchange for that interest. But, there is no evidence of the value of McCarthy's trade-in property and thus no evidence of what McCarthy "paid" for its partnership interest. Evidence that shows only one side of the financial picture is insufficient. (*Robert L. Cloud & Associates, Inc. v. Mikesell* (1999) 69 Cal.App.4th 1141, 1152.) For example, it is possible that the value of the trade-in property equaled or exceeded the value of the partnership interest. Accordingly, there is no evidence of the

value of that option. Moreover, since it was the option to buy into Sandridge that was part of the consideration paid for Liberty Ranch, not the value of the partnership interest, the trial court erred in concluding that the estimated value of McCarthy's interest in Sandridge was a component of Liberty Ranch's fair market value in 2009.

The trial court also considered the facilitating of the section 1031 exchange as evidence of Liberty Ranch's 2009 value. However, this was a separate transaction where McCarthy purchased property from Sandridge. There was no evidence as to the value of the section 1031 exchange to McCarthy and thus it is not substantial evidence of the fair market value of Liberty Ranch. (Cf. *Newhart v. Pierce* (1967) 254 Cal.App.2d 783, 790-792.)

Before the sale to Sandridge, McCarthy was leasing approximately 15,000 acres of Liberty Ranch land to Dublin Farms, a company owned by individuals related to McCarthy. Dublin Farms was eligible for, and receiving, Farm Service Agency (FSA) subsidies. As part of the purchase agreement, Sandridge agreed to lease this land to McCarthy and permit McCarthy to sublease the land to Dublin Farms. In 2010 and 2011, McCarthy and Dublin Farms received annual farming subsidies of $300,000 to $400,000. The trial court concluded that these subsidies added to the 2009 Liberty Ranch value. However, again, these subsidies represent only one side of the financial picture. There was no evidence of what McCarthy paid Sandridge to lease the 15,000 acres. Accordingly, it is unknown what the net profit, if any, was from the farming subsidies. Thus, the receipt of these subsidies is not substantial evidence of Liberty Ranch's fair market value.

The trial court further found that Sandridge's agreement to indemnify McCarthy from any liability due to the Liberty Ranch sale indicated that Sandridge paid more than the $41 million purchase price. But, once more, there is no evidence of the value of that indemnity provision at the time of the breach. KCV and Grow were unable to place any value on it.

20.

Contrary to KCV and Grow's position, Sean McCarthy's statement in a November 2009 email expressing concern that KCV and Grow might claim damages that "could include the entire project (what ever that is), and the number could be huge" is not an opinion of Liberty Ranch's value. Rather, it refers to concern about what KCV and Grow might claim.

KCV and Grow also assert that an estate appraisal of Sandridge completed in 2013 that adjusted the fair market value of its properties down by $105.8 million was based on estimated litigation exposure and therefore is evidence of the 2009 value of Liberty Ranch. Again, this claim is unfounded. The appraiser reduced the appraised value of three different ranches, Kettleman City Ranch, Sandridge Utica Ranch, and White Ranch, noting that there were two pending lawsuits that directly affected the marketability of three individual properties. Thus, this was not a litigation exposure assessment.

Regarding the incomplete evidence of the noncash elements of the Liberty Ranch sale, KCV and Grow argue that, because the values were within Sandridge and McCarthy's ability to produce, the jury could draw adverse inferences from Sandridge and McCarthy's failure to present this evidence. However, the burden was on KCV and Grow to present evidence of the fair market value of Liberty Ranch, not Sandridge and McCarthy.

In sum, the only expert opinion valued Liberty Ranch in 2009 at below the option price. Further, the attempt to extrapolate the owner's opinion of value from the various components of the 2009 transaction between McCarthy and Sandridge relied on misinterpretations of the record and incomplete evidence.

### iii. In the absence of expert or owner testimony required by Evidence Code section 813, the jury could not properly value Liberty Ranch based on water.

KCV and Grow note that, in addition to evidence of a property owner's valuation of his own property, other types of evidence are relevant to determining fair market value. For example, the price paid by a recent buyer or a subsequent sale may be

21.

evidence of the property's value on the date of the breach. (*Dennis v. County of Santa Clara* (1989) 215 Cal.App.3d 1019, 1028; *Nielsen v. Farrington* (1990) 223 Cal.App.3d 1582, 1586.) KCV and Grow further point out that courts have held, in eminent domain proceedings, that the existence of valuable mineral deposits is an element that may be considered insofar as it influences the market value of the land. (*Ventura County Flood Control Dist. v. Campbell* (1999) 71 Cal.App.4th 211, 219.) "Although it is generally not proper to reach an award by separately evaluating the land and the deposits, 'it is possible to capitalize potential royalties, by multiplying the reasonably probable royalty rate by the estimated tonnage of mineral in place and reducing the result to present value.' " (*Id.* at pp. 219-220.)

Relying on these authorities, KCV and Grow posit that the jury could, and reasonably did, value Liberty Ranch based on its reliable ground water supply. Noting there was evidence presented on the various prices of water ranging from $4,285 per acre-foot to $5,775 per acre-foot, KCV and Grow argue that Liberty Ranch's 25,000 acre-feet per year allocation of ground water was worth between approximately $107 million and $144 million. According to KCV and Grow, expert evidence was unnecessary for valuing the property in this manner. Therefore, KCV and Grow contend, this water value was substantial evidence of Liberty Ranch's 2009 value.

In support of this position, KCV and Grow cite *Foreman & Clark Corp. v. Fallon* (1971) 3 Cal.3d 875 (*Foreman & Clark Corp.*). In that case, the court held that, when valuing property, the trier of fact can reject the testimony of an expert witness and follow other evidence in the case. (*Foreman & Clark Corp., supra,* 3 Cal.3d at p. 890.)

However, when *Foreman & Clark Corp.* was decided, Evidence Code section 813 applied only to eminent domain and condemnation proceedings. The court acknowledged that condemnation proceedings required different rules with regard to expert testimony, citing Evidence Code section 810 et seq. (*Foreman & Clark Corp.*, *supra*, 3 Cal.3d at p. 890.) But, in 1980, the limitation on the application of Evidence

22.

Code section 810 et seq. to eminent domain and condemnation proceedings was removed. (Stats. 1980, ch. 381, § 1, p. 757.)

Therefore, as applicable here, Evidence Code section 813 requires that the value of the property be shown only by the opinions of witnesses qualified to express such opinions or the owner of the property being valued. And, while the existence of natural resources is an element that may be considered in valuing the land, expert testimony is still required. (Cf. *San Diego Gas & Electric Co. v. Schmidt* (2014) 228 Cal.App.4th 1280, 1289-1291.) Again, KCV and Grow did not present any expert or owner opinion testimony on Liberty Ranch's fair market value in 2009. As recognized by the trial court, the law precludes a jury from making an independent valuation of the property. Accordingly, the evidence of what water was being sold for per acre-foot cannot support the compensatory damage award. To hold otherwise would permit the jury to use evidence to support a verdict outside the range of opinion testimony in violation of Evidence Code section 813. (*Wherity, supra,* 275 Cal.App.2d at p. 249.)

### iv. *The instructions did not remove the limits on the evidence.*

KCV and Grow also assert that the instructions given to the jury on damages permitted the jury to determine the fair market value of Liberty Ranch without any limitations on the types of evidence it could consider. KCV and Grow rely on the general rule that the appellate court reviews the sufficiency of the evidence to support a verdict under the law stated in the instructions given, rather than under some other law on which the jury was not instructed. (*Bullock v. Philip Morris USA, Inc.* (2008) 159 Cal.App.4th 655, 674-675.) KCV and Grow argue that, because the jury did not receive any instructions defining "fair market value" or explaining the expert testimony requirement, the jury was permitted to rely on evidence prohibited by Evidence Code section 813.

However, to qualify as substantial evidence, the evidence must be substantial proof of the essentials that the law requires. (*Barratt American, Inc. v. Transcontinental Ins. Co.* (2002) 102 Cal.App.4th 848, 861.) One essential the law requires is that real

23.

property value be shown by an opinion of either an expert or an owner. (Evid. Code, § 813, subd. (a).)

The instructions specified that KCV and Grow were required to prove the fair market value of Liberty Ranch. Thus, the jury was instructed on the applicable rule of law. The absence of a specific instruction on what evidence the jury could consider did not relieve KCV and Grow of their burden to present legally competent evidence to prove this value, i.e., expert or owner opinion testimony. In fact, the trial court would not permit the jury to make an independent valuation of the property and precluded KCV and Grow from urging the jury to do so. Unlike the situation in *Bullock v. Philip Morris USA, Inc.*, *supra*, Sandridge is not seeking reversal based on a substantive element that did not appear in the instructions. Therefore, KCV and Grow's argument that the jury could consider any evidence to determine fair market value lacks merit.

### v. The court erred in admitting evidence of the Mojave water sale.

In 2009, Sandridge sold some of its State Water Project contract rights to the Mojave Water Agency for approximately $73.5 million. Although the trial court excluded this sales price evidence during the liability phase, it admitted the evidence during the damages phase. However, the trial court later acknowledged, outside the jury's presence, that it erred in allowing that evidence to come in and stated it would not allow that evidence to be argued.

Sandridge argues the Mojave sales price evidence was irrelevant to the fair market value of Liberty Ranch and its admission was prejudicial. According to Sandridge, state project water is entirely different from an allocation from the Angiola Water District and thus the sale of project water has no relevance to the Liberty Ranch value. Sandridge further contends this evidence was prejudicial in that it encouraged the jury to speculate as to damages in violation of Evidence Code section 813.

KCV and Grow respond that the price Sandridge obtained for the Mojave water sale was highly relevant to calculating damages because the jury could extrapolate

24.

Liberty Ranch's water value from the Mojave deal. KCV and Grow contend that, because the Angiola water could be severed from the land and sold on the open market, the price Sandridge received when it sold some of its project water on the open market was probative of what Liberty Ranch's water was worth on the open market. According to KCV and Grow, the jury was permitted to consider all evidence regarding value without restriction.

However, as discussed above, the jury could not properly value Liberty Ranch based on the value of its water. Rather, real property value may only be shown through expert or owner testimony. Under Evidence Code section 813, the jury is restricted on the evidence that can be considered in arriving at fair market value. Thus, the Mojave sales price evidence was irrelevant for determining Liberty Ranch's value.

Moreover, state project water and Angiola water are not comparable. Ernest Conant, general counsel to the Angiola Water District, explained the differences between project water and Angiola rights. Project water rights are transferrable whereas the right to Angiola water is based on property ownership and is shared with other property owners overlying a groundwater basin. Also, the property owners depend in part on "return flow," i.e., irrigation water that gets returned to the groundwater basin, to refresh the shared groundwater supply. Therefore, legally and politically, land owners are not permitted to transfer Angiola water outside the Tulare basin. Thus, the number of potential buyers of groundwater is considerably lower than buyers of project water entitlements. Accordingly, these two types of water rights are not sufficiently alike with respect to character, situation and usability to be considered comparable in terms of value. (Evid. Code, § 816.)

In addition to being irrelevant, the Mojave sales price evidence was prejudicial. In other words, there is a reasonable chance that Sandridge would have achieved a more favorable result in the absence of that irrelevant evidence. (*Cassim v. Allstate Ins. Co.* (2004) 33 Cal.4th 780, 802; *College Hospital Inc. v. Superior Court* (1994) 8 Cal.4th

25.

704, 715.)  First, the nearly identical numbers, the $73.5 million Mojave sales price and the $73.4 million in damages, indicate the jury was highly influenced by the Mojave sale evidence.  The properly admitted evidence does not lend itself to a calculation that leads to that number.  Further, this evidence encouraged the jury to value Liberty Ranch based on the value of its water alone in violation of Evidence Code section 813.  In fact, during closing arguments, KCV and Grow's attorney referred to the Mojave sale in a power point presentation.

In sum, neither expert nor owner opinion testimony supports the compensatory damages award.  KCV and Grow had the burden to show that the fair market value of Liberty Ranch at the time of the breach exceeded the option price and failed to present competent evidence to do so.  Further, the Mojave sales price evidence was irrelevant and prejudicial.  Therefore, the compensatory damages award must be reversed.

### vi.  *KCV and Grow are entitled to a limited new trial on damages.*

While KCV and Grow have the right to recover the option payments and their entitlement expenses, the general verdict does not segregate those elements of damages.  The amount of the option payments, approximately $354,000, is undisputed.  However, the parties disagree on the amount of the entitlement expenses.  Accordingly, KCV and Grow are entitled to a new trial on that element of damages.

Nevertheless, because KCV and Grow did not present sufficient evidence of Liberty Ranch's fair market value, they are not entitled to a new trial on that damage component.  " ' When the plaintiff has had full and fair opportunity to present the case, and the evidence is insufficient as a matter of law to support plaintiff's cause of action, a judgment for defendant is required and no new trial is ordinarily allowed, save for newly discovered evidence.…" (*Kelly v. Haag* (2006) 145 Cal.App.4th 910, 919 (*Kelly*).)  In another context, the California Supreme Court explained that "[f]or our justice system to function, it is necessary that litigants assume responsibility for the complete litigation of their cause during the proceedings." (*Silberg v. Anderson* (1990) 50 Cal.3d 205, 214.)

26.

KCV and Grow had a full and fair opportunity to present their case for damages based on the value of Liberty Ranch versus the option price but failed to do so. Thus, the proper resolution is to not remand for retrial on that issue. (*Kelly, supra*, 145 Cal.App.4th at p. 919; accord, *Kim v. Westmoore Partners, Inc.* (2011) 201 Cal.App.4th 267, 289; *Frank v. County of Los Angeles* (2007) 149 Cal.App.4th 805, 833-834.)

Punitive damages must bear a reasonable relation to the actual damages. Thus, the reversal of the compensatory damages requires that the punitive damages be redetermined as well. (*Liodas v. Sahadi* (1977) 19 Cal.3d 278, 284.) In light of this conclusion, there is no need to consider KCV and Grow's appeal of the trial court's order reducing the punitive damages award.

**5.    *The record supports the jury's finding of oppression, fraud, or malice.***

"In an action for the breach of an obligation not arising from contract, where it is proven by clear and convincing evidence that the defendant has been guilty of oppression, fraud, or malice, the plaintiff, in addition to the actual damages, may recover damages for the sake of example and by way of punishing the defendant." (Civ. Code, § 3294, subd. (a).)

Here, the jury found that both Vidovich and Sandridge acted with malice, oppression or fraud in interfering with the Liberty Ranch option agreements. On review, we determine whether substantial evidence supports this finding. Accordingly, we must consider the evidence in the light most favorable to KCV and Grow, giving them the benefit of every reasonable inference, and resolving conflicts in support of the judgment. Although the jury had to find clear and convincing evidence of oppression, fraud, or malice, the substantial evidence standard on appeal is not altered. (*In re Marriage of Murray* (2002) 101 Cal.App.4th 581, 602-603.)

Vidovich argues that he cannot be liable for punitive damages because the dispute arose from each side asserting rights under signed writings. In other words, the case

sounded in contract, not tort. Vidovich further asserts that he believed the July 12, 2009 letter agreement with KCV was enforceable and therefore was acting in good faith.

However, the jury was not required to accept Vidovich's claim that he was acting in good faith because he believed the July 12, 2009 letter agreement was binding on KCV. Further, the jury could have concluded that the July 12, 2009 letter agreement was a product of Vidovich's interference, i.e., one of the tools he used to accomplish his goal of interfering with the option contracts.

Moreover, although a party to the July 12, 2009 letter agreement, Vidovich was not a party to the Liberty Ranch option contracts. Thus, the rule that tortious interference liability cannot lie against a party to the disputed contract at issue does not apply. Vidovich was an outsider to the contractual relationship he interfered with. (*Applied Equipment Corp. v. Litton Saudi Arabia Ltd.* (1994) 7 Cal.4th 503, 514.)

Vidovich also contends that the jury's finding of oppression, fraud, or malice is not supported by substantial evidence. He argues that, even if he committed a tort, his conduct was not so egregious that punitive damages are warranted.

" 'Something more than the mere commission of a tort is always required for punitive damages. There must be circumstances of aggravation or outrage, such as spite or "malice," or a fraudulent or evil motive on the part of the defendant, *or such a conscious and deliberate disregard of the interests of others that his conduct may be called wilful or wanton.*' " (*Taylor v. Superior Court* (1979) 24 Cal.3d 890, 894-895.)

Malice requires proof that the defendant engaged in conduct that either was intended to cause injury to the plaintiff or was despicable and carried on with a willful and conscious disregard of the rights or safety of others. (Civ. Code, § 3294, subd. (c)(1).) "Oppression" requires proof of despicable conduct that subjects the plaintiff to cruel and unjust hardship in conscious disregard of the plaintiff's rights. (Civ. Code, § 3294, subd. (c)(2).) To demonstrate "fraud," the plaintiff must show that the defendant intentionally misrepresented, deceived, or concealed a material fact known to the

28.

defendant with the intent to thereby deprive the plaintiff of property or legal rights or otherwise cause injury. (Civ. Code, § 3294, subd. (c)(3).)

The trial court concluded that the pattern and series of acts undertaken by Vidovich in inducing McCarthy to sell Liberty Ranch to him rather than KCV and Grow supported the jury's finding of oppression, fraud, or malice. These acts include: (1) Installing a pipeline to move Liberty Ranch water to property owned by Sandridge and leasing Liberty Ranch water subject to confidential terms knowing that the Liberty Ranch options had been signed and option payments had been made; (2) writing a letter dated May 12, 2009, to Pat McCarthy and two attorneys regarding the Liberty Ranch options explaining that he was taking title to Liberty Ranch subject to KCV's options, requesting that McCarthy speak to him before communicating with Hays, and urging McCarthy to write to Hays to question a unilateral date change Hays made in the option contract; (3) undermining potential financing for KCV based on a water swap proposal by incorrectly informing the Dudley Ridge Water District that KCV no longer held an option on Liberty Ranch; (4) incorrectly representing to McCarthy that KCV's options had terminated; and (5) pushing McCarthy to close early, outside of escrow and without title insurance, and by agreeing to indemnify McCarthy, knowing McCarthy would be breaching its option contracts with KCV and Grow.

Considering the evidence in the light most favorable to KCV and Grow and giving them the benefit of every reasonable inference, the record supports the jury's finding. The evidence indicates that Vidovich was determined to acquire Liberty Ranch and was willing to do whatever it took to accomplish his goal. The jury could reasonably find that, through his high pressure tactics, intentional interference, and misrepresentations, Vidovich manipulated the situation to his advantage and that this conscious and deliberate disregard of the interests of KCV and Grow was willful or wanton.

29.

## DISPOSITION

The compensatory and punitive damages awards are reversed and the matter remanded for further proceedings consistent with this opinion. In all other respects, the judgment is affirmed. The parties shall bear their own costs on appeal.

_____

LEVY, J.

WE CONCUR:


_____

HILL, P.J.


_____

GOMES, J.