Filed 10/1/20  In re R.C. CA2/6

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION SIX

| | |
|---|---|
| IN RE R.C., A Person Coming Under the Juvenile Court Law. _____ THE PEOPLE OF THE STATE OF CALIFORNIA,      Plaintiff and Respondent, v. R.C.,      Defendant and Appellant. | 2d Juv. No. B301298 (Super. Ct. No. PJ52748) (Los Angeles County) |

R.C. appeals the juvenile court's order sustaining a wardship petition after finding true allegations that appellant committed an assault with a firearm (Pen. Code,[1] § 245, subd. (a)(2)) and an assault with a deadly weapon (*id.*, subd. (a)(1)).

---

[1] All statutory references are to the Penal Code unless otherwise stated.

(Welf. & Inst. Code, § 602.)  The court also found true allegations as to both counts that appellant personally used and discharged a firearm (§ 12022.53).[2]  Appellant was declared a ward with a maximum term of confinement of 15 years and was placed in Dorothy Kirby Center for treatment.  Appellant contends (1) the court erred in excluding certain evidence as inadmissible hearsay; (2) the court erred in denying his motion to dismiss for failure to preserve exculpatory evidence, as contemplated in *California v. Trombetta* (1984) 467 U.S. 479 [81 L.Ed.2d 413] (*Trombetta*) and *Arizona v. Youngblood* (1988) 488 U.S. 51 [102 L.Ed.2d 281] (*Youngblood*); and (3) the evidence is insufficient to support the finding that appellant committed an assault with a firearm and the allegations that he personally used a firearm.  We affirm.

## FACTS AND PROCEDURAL HISTORY
### *Prosecution*

Shortly before 10:00 a.m. on September 25, 2019, Walter Alcott was sitting in his parked vehicle in North Hills with the windows rolled down when he heard a gunshot.  Alcott, who had regularly used firearms for over 35 years and recognized the

---

[2] The petition also alleged that appellant committed an attempted murder (§§ 187, 664) and that all of the offenses were committed for the benefit of a criminal street gang (§ 186.22, subd. (b)(1)(B)).  After the prosecution rested its case-in-chief, appellant filed a motion for acquittal under Welfare and Institutions Code section 701.1.  The prosecution conceded that the evidence was insufficient to support the gang enhancement allegations because the expert who would testify to the requisite predicate gang offenses was unavailable, and accordingly moved to dismiss those allegations.  The court granted the motion, and also dismissed the attempted murder count for insufficient evidence.

2

sound of a "real firearm," looked in the direction of the gunshot he had heard and saw a male standing in the middle of the street at least 100 feet away pointing a gun at another man. The armed male shot at the other man three times, then ran away. Alcott took several photographs of the fleeing male and initially decided to follow him, then pulled over and called the police.

Maria Prudencio also heard the gunshots and saw a male repeatedly shooting at another person before fleeing. Prudencio had no experience with guns and did not know whether the weapon was a firearm or a BB gun, but the noises she heard sounded like gunshots. She also saw the victim "moving from one side to the other" while the shooter was firing at him.

The shootings were depicted on surveillance video from three nearby locations. After reviewing the videos, the police were able to identify appellant as the shooter and arrested him. The firearm used to commit the crime was never found.

Appellant has gang tattoos that are associated with the Langdon Street gang, and the shooting took place in the gang's territory. According to the prosecution's gang expert, gang members instill fear in others by using firearms, not BB guns; firing a BB gun would be "more of a joke." The expert, who had investigated over 500 gang-related cases, had never seen a case in which a gang member had shot at a rival with a BB gun. Although no shell casings were recovered from the scene, a revolver does not eject spent casings.

### Defense

Los Angeles Police Officer Konrad Vollmer was one of the officers who responded to the scene after the shooting. Officer

3

Vollmer interviewed Jorge Ocampo, the victim of the shooting.[3] At one point during the interview, Ocampo stated that the weapon used to fire at him was "a BB gun, a pellet gun.

Ocampo went on to state, however, that just before the shooting, the shooter approached him and asked him where he was from. Ocampo responded, "nowhere." The shooter replied "Sepas Langdon. I got you now." The shooter then removed a gun from his waistband that "looked like a revolver, 38" and fired at Ocampo five or six times. Ocampo described "hearing the five popping noises like a gun and also smoke coming from that area." Ocampo also saw and heard the bullets "fly by him" and demonstrated how he "sidestepp[ed] or mov[ed] to his side" to avoid being shot.

Ocampo said "he was in shock from what just happened" because the shooter had repeatedly fired at him and he "could have been smoked," i.e., killed. He also said the shooter had approached him the day before and asked him "where he was from." Officer Vollmer believed that Ocampo had initially minimized the incident because he feared gang retaliation.

A law student acting on appellant's behalf conducted an internet search to see if a weapon that looked like a revolver could be a BB gun. The law student saw various "revolver-style" BB guns online, but did not actually see any of the guns. Moreover, she had never held a BB gun or a revolver and did not know what a revolver sounds like.

---

[3] Ocampo did not testify at the hearing. He is apparently homeless and could not be located.

4

## DISCUSSION
### *Inadmissible Hearsay*

Appellant moved in limine to admit the statement of an unidentified woman that was recorded on an investigating police officer's body camera after the shooting.[4] As Officer Patrick Baghdashrian was about to approach witnesses Alcott and Prudencio near the scene of the shooting, the unidentified woman walked past the officer and said "[i]t didn't sound like a real gun." Appellant claimed that although the statement was hearsay, it was admissible (1) as a spontaneous statement under Evidence Code section 1240, and (2) to impeach the prosecution's gang expert's opinion that a gang member would not use a BB gun to shoot at a rival. The court found otherwise and accordingly excluded the evidence as inadmissible hearsay. Appellant contends the court erred in excluding the statement. We disagree.

Out-of-court statements offered for the truth of the matter asserted are hearsay. (Evid. Code, § 1200, subd. (a).) Hearsay is inadmissible unless it falls under one of the exceptions to the hearsay rule. (*Id.*, subd. (b).) Under Evidence Code section 1240, "[e]vidence of a statement is not made inadmissible by the hearsay rule if the statement: [¶] (a) Purports to narrate, describe, or explain an act, condition, or event perceived by the declarant; and [¶] (b) Was made spontaneously while the declarant was under the stress of excitement caused by such perception." (§ 1240, subds. (a), (b).)

---

[4] Appellant asserts that the recorded statement was made 20 minutes after the shooting. The record reflects, however, that the statement at issue was recorded at 1:00 p.m., while the shooting occurred at approximately 10:00 a.m.

In determining whether a statement is admissible under Evidence Code section 1240, "'[t]he crucial element [is] . . . the mental state of the speaker.'" (*People v. Brown* (2003) 31 Cal.4th 518, 541.) "'The nature of the utterance—how long it was made after the startling incident and whether the speaker blurted it out, for example—may be important, but solely as an indicator of the mental state of the declarant.'" (*Ibid.*) "'Neither lapse of time between the event and the declarations nor the fact that the declarations were elicited by questioning deprives the statements of spontaneity if it nevertheless appears that they were made under the stress of excitement and while the reflective powers were still in abeyance.' [Citation.]" (*People v. Poggi* (1988) 45 Cal.3d 306, 319, italics omitted.)

Whether a hearsay statement qualifies as a spontaneous statement is generally a question of fact for the trial court, and its determination involves an exercise of the court's discretion. (*People v. Merriman* (2014) 60 Cal.4th 1, 65.) We will uphold the trial court's determination of facts if it is supported by substantial evidence and review its decision to admit the evidence for abuse of discretion. (*Ibid.*)

The juvenile court did not abuse its discretion in finding that the subject statement did not qualify as a spontaneous statement under Evidence Code section 1240. After reviewing the recording, Officer Baghdasarian noted that the woman who made the statement was "mild mannered" rather than nervous or excited. Moreover, the woman continued "casual[ly]" walking away after making the statement. As the People note, it is also unclear whether the woman actually saw or heard anything regarding the shooting. Because the evidence supports a finding that the statement was not made under the stress of excitement from having witnessed the shooting, the court did not abuse its

discretion in finding it was not spontaneous within the meaning of Evidence Code section 1240.

Appellant also failed to establish that the statement was admissible as impeachment evidence.  The single case he cites in support of his claim, *Am-Cal Inv. Co. v. Sharlyn Estates, Inc.* (1967) 255 Cal.App.2d 526, merely recognizes that prior inconsistent statements of a testifying witness or a hearsay declarant are admissible for impeachment and are not hearsay because they are not offered for the truth of the matter asserted. (*Id.* at p. 542.)  The court in that case reasoned "that where a witness in court testifies to admissible extrajudicial statements of a third party declarant, the prior or subsequent inconsistent statements of the declarant may be received when offered in evidence for purposes of impeachment.  [Citations.]  . . .  The foregoing rule applies where the hearsay testimony is properly admitted under some exception to the hearsay rule."  (*Ibid.*)

Here, appellant did not offer the recorded statement as a prior inconsistent statement of a testifying witness or hearsay declarant.  To the extent he claims the statement undermined the gang expert's opinion that a gang member would not shoot at a rival with a BB gun, the statement was plainly offered for the truth of the matter asserted, i.e., that the weapon used in the shooting "didn't sound like a real gun."  The court thus did not abuse its discretion in excluding the statement as inadmissible hearsay.[5]

_____

[5] For the first time on appeal, appellant also contends the statement was admissible as a public employee record under Evidence Code section 1280.  Appellant did not urge the court to admit the evidence on this ground, so his contention is forfeited.  In any event, admitting the body cam recording or the transcript

7

In any event, appellant fails to demonstrate a reasonable probability that he would have achieved a more favorable result had the evidence been admitted.  (*People v. Watson* (1956) 46 Cal.2d 818, 836; see also *People v. Marks* (2003) 31 Cal.4th 197, 226-227 [errors in application of the ordinary rules of evidence are reviewed under the standard set forth in *Watson*].)  The juvenile court, as trier of fact, was presented with evidence that Ocampo had initially described the weapon as a BB gun.  Ocampo, however, went on to identify the weapon as a 38-caliber revolver and described seeing and hearing bullets fly by him as appellant was shooting at him.  Alcott, who witnessed the shooting and testified to his experience with firearms, also unequivocally stated that the weapon was a firearm.  As the People aptly put it, "[t]he additional ambiguous statement of an anonymous person does not render a different result plausible, much less reasonably probable."  Accordingly, any error in excluding the evidence was harmless.

### Trombetta/Youngblood *Motion*

In addition to moving to admit the unidentified woman's statement that "[i]t didn't sound like a real gun," appellant moved to dismiss the section 602 petition pursuant to *Trombetta* and *Youngblood* on the ground that the prosecution failed to obtain the unidentified woman's name and contact information.  The court denied the motion, reasoning that "there is no due

---

of that recording under the public records exception would not render the statements contained within that recording admissible for the truth of the matter asserted.  For the statements to be admissible for that purpose, appellant had to establish a hearsay exception.  (See *People v. Sanchez* (2016) 63 Cal.4th 665, 675 ["Multiple hearsay may not be admitted unless there is an exception for each level"].)  Appellant did not do so here.

process violation in the failure to obtain the name and address of this woman." Appellant contends the court erred. We disagree.

"Due process requires the state preserve evidence in its possession where it is reasonable to expect the evidence would play a significant role in the defense." (*People v. Alexander* (2010) 49 Cal.4th 846, 878.) "The evidence must 'possess an exculpatory value that was apparent before the evidence was destroyed, and be of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means.'" (*Ibid.*, quoting *Trombetta, supra,* 467 U.S. at p. 489.) "If the evidence's exculpatory value is apparent and no comparable evidence is reasonably available, due process precludes the state from destroying it." (*People v. Duff* (2014) 58 Cal.4th 527, 549.) "If, however, 'no more can be said [of the evidence] than that it . . . *might have* exonerated the defendant,' [citation] the proscriptions of the federal Constitution are narrower; 'unless a criminal defendant can show bad faith on the part of the police, failure to preserve potentially useful evidence does not constitute a denial of due process of law.'" (*Ibid.*, quoting *Youngblood, supra,* 488 U.S. at pp. 57-58.) "Thus, there is a distinction between *Trombetta*'s 'exculpatory value that was apparent' criteria and the standard set forth in *Youngblood* for 'potentially useful' evidence. If the higher standard of apparent exculpatory value is met, the motion [to dismiss] is granted in the defendant's favor. But if the best that can be said of the evidence is that it was 'potentially useful,' the defendant must also establish bad faith on the part of the police or prosecution." (*People v. Alvarez* (2014) 229 Cal.App.4th 761, 773 (*Alvarez*).) "On review, we must determine whether, viewing the evidence in the light most favorable to the superior court's finding, there was

9

substantial evidence to support its ruling." (*People v. Roybal* (1998) 19 Cal.4th 481, 510.)

Substantial evidence supports the court's denial of appellant's *Trombetta/Youngblood* motion. Although law enforcement has a duty to preserve exculpatory or potentially exculpatory evidence in its possession, "due process does not require the police to collect particular items of evidence. [Citation.] 'The police cannot be expected to "gather up everything which might eventually prove useful to the defense."' [Citation.]" (*People v. Montes* (2014) 58 Cal.4th 809, 837 see also *People v. Daniels* (1991) 52 Cal.3d 815, 855 ["[T]he police duty to obtain exculpatory evidence is not as strong as its duty to preserve evidence already obtained"].) "To date there is no authority for the proposition that sanctions should be imposed for a failure to *gather* evidence as opposed to a failure to preserve evidence." (*People v. Harris* (1985) 165 Cal.App.3d 324, 329; see also *People v. Bradley* (1984) 159 Cal.App.3d 399, 406 ["[W]e have found no cases of precedential value which squarely hold that the prosecution's duty to preserve material evidence encompasses an initial duty to affirmatively collect or gather or seize potentially material evidence in the course of an investigation for defendant's use"].) Appellant does not cite any such authority.

Moreover, the statement "it didn't sound like a real gun" may or may not have been exculpatory. It is unclear whether the speaker of that statement actually heard the gunshots or whether she has any particular experience regarding the sounds emitted by "real" guns. "[T]he mere 'possibility' that information . . . may ultimately prove exculpatory 'is not enough to satisfy the standard of constitutional materiality.'" (*City of Los Angeles v. Superior Court* (2002) 29 Cal.4th 1, 8, quoting *Youngblood, supra,* 488 U.S. at p. 56.)

Since "the best that can be said of the evidence is that it was 'potentially useful'" (*Alvarez, supra*, 229 Cal.App.4th at p. 773), to warrant the sanction of dismissal appellant would have to establish that the police acted in bad faith in failing to obtain more information from the unidentified woman. Appellant made no such showing here. Although he offers that the police "preserved the testimony of witnesses" Alcott and Prudencio, Alcott (who reported the shooting to the police) and Prudencio made clear that they were witnesses to the shooting and made themselves available for further questioning. As Officer Baghdarian testified, when the unidentified woman walked past him he was focused on identifying the perpetrator of the shooting and Ocampo had indicated that the weapon used in the shooting was a BB or pellet gun. Moreover, Officer Baghdarian testified that he had no independent recollection of the woman having made the statement recorded on his body cam. Viewing the record in the light most favorable to the juvenile court's ruling, the court could reasonably conclude "[t]here is no evidence of official animus toward defendant on the part of [Officer Baghdarian] or any conscious effort on his part to suppress exculpatory evidence." (*People v. Angeles* (1985) 172 Cal.App.3d 1203, 1214.) Accordingly, appellant's *Trombetta/Youngblood* motion to dismiss was properly denied.

### *Sufficiency of the Evidence*

Appellant claims the evidence is insufficient to support the juvenile court's finding that the weapon he used to shoot at Ocampo was a firearm rather than a BB gun. In adjudicating this claim, we "must review the whole record in the light most favorable to the judgment to determine whether it contains substantial evidence—i.e., evidence that is credible and of solid value—from which a reasonable trier of fact could have found the

11

defendant guilty beyond a reasonable doubt." (*People v. Nguyen* (2015) 61 Cal.4th 1015, 1054-1055, internal quotation marks omitted.) We "presume in support of the judgment the existence of every fact the jury could reasonably have deduced from the evidence." (*People v. Zamudio* (2008) 43 Cal.4th 327, 357.) "A reversal for insufficient evidence 'is unwarranted unless it appears "that upon no hypothesis whatever is there sufficient substantial evidence to support"' the jury's verdict." (*Ibid.*)

A firearm is "a device, designed to be used as a weapon, from which is expelled through a barrel, a projectile by the force of an explosion or other form of combustion." (§ 16520, subd. (a); accord, CALCRIM No. 980.) A pellet or BB gun, which "uses compressed air rather than an explosive to project a bullet, . . . is not a 'firearm' as that word is commonly defined. [Citation.]" (*In re Jose A.* (1992) 5 Cal.App.4th 697, 700-701.) "The fact that an object used by a [criminal perpetrator] was a 'firearm' can be established by direct or circumstantial evidence." (*People v. Monjaras* (2008) 164 Cal.App.4th 1432, 1435.)

"Most often, circumstantial evidence alone is used to prove [an] object was a firearm. This is so because when faced with what appears to be a gun, displayed with an explicit or implicit threat to use it, few victims have the composure and opportunity to closely examine the object; and in any event, victims often lack expertise to tell whether it is a real firearm or an imitation." (*People v. Monjaras*, *supra*, 164 Cal.App.4th at p. 1436.) Accordingly, "[c]ircumstantial evidence alone is sufficient to support a finding that an object used by a [criminal perpetrator] was a firearm." (*Ibid.*) When a defendant commits a crime with an object that looks like a gun, "the object's appearance and the defendant's conduct and words in using it may constitute sufficient circumstantial evidence to support a finding that it was

12

a firearm within the meaning of section 12022.53, subdivision (b). In other words, the victim's inability to say conclusively that the gun was real . . . does not create a reasonable doubt, as a matter of law, that the gun was a firearm." (*Id.* at p. 1437.)

Sufficient evidence supports the finding that appellant assaulted Ocampo with a firearm rather than a BB gun. In arguing to the contrary, appellant makes no reference to Ocampo's detailed description of the weapon as a firearm. He also downplays Alcott's testimony that he saw and heard appellant shoot at Ocampo with a firearm. As the People note, "[t]he determination . . . whether the gun here was a firearm or a BB gun was a disputed question for the juvenile court to resolve as the trier of fact. Mr. Alcott's testimony alone was sufficient to prove the weapon was a firearm." Appellant's claim of insufficient evidence thus fails.

## DISPOSITION

The juvenile court's order is affirmed.

NOT TO BE PUBLISHED.


PERREN, J.

We concur:


GILBERT, P.J.


TANGEMAN, J.

13

Christina L. Hill, Judge
Superior Court County of Los Angeles
_____

Sean K. Kennedy, Tiffany Wood, Certified Law Student, Center for Juvenile Law and Policy, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Senior Assistant Attorney General, Paul M. Roadarmel, Jr., Supervising Deputy Attorney General, David F. Glassman, Deputy Attorney General, for Plaintiff and Respondent.